SAMUEL A. WILLIAMS, Appellant, v. ALICE U. HARRISON et al., Appellees.

No. 45245.

JUNE 18, 1940.

Prichard & Prichard, for appellant.

Underhill & Underhill and Anderson & Bails, for appellees.

BLISS, J.—Ed. M. Harrison died intestate in Monona county, Iowa, on January 13, 1938, leaving as his widow the defendant Alice U. Harrison, and the other 31 defendants and the plaintiff, as his only heirs at law. His estate consisted of a quarter section farm, and a residence property in town, appraised respectively at $19,000 and $4,000, and personal property valued at about $5,000. The deceased had no children, and his widow took the residence property at the above-stated valuation as a credit upon the statutory $7,500 to which she was entitled.

Plaintiff alleged that while he was a tenant farmer in Nebraska, the deceased, who was his mother's brother, came to his home, on or about November 1, 1920, and orally proposed to plaintiff that if he would return to Monona county, and assist the decedent in the conduct of his affairs and particularly his farming operations, the plaintiff should have as his own at the death of the decedent, the quarter section farm, above referred to, and that plaintiff accepted the proposition and the contract was fully consummated; that plaintiff returned to Monona county before March 1, 1921, and thereafter and until the death of decedent, he fully carried out his agreement. In addition to specific performance he prayed that title to said farm be quieted in him. The defendants denied gen-

erally in their answer, and also alleged that the land was the property of the widow and heirs of the intestate, setting out their names and respective interests, and praying for a decree establishing these interests. Plaintiff's petition was filed on January 7, 1939.

The record shows, without dispute, that the plaintiff was born in 1879, and that his mother died in May 1880, when he was 14 months old, at which time he was taken into the home of his maternal grandparents, where he remained until 1892, when he went to live in the home of the intestate, Ed. M. Harrison. He lived with the latter until February 1908, when he married and went to Nebraska, where he lived and farmed until his return to Iowa in 1921. Three daughters were born in Nebraska. During his sojourn there, the decedent and his wife visited the defendant and his family a number of times, and the latter made return visits to Monona county. It is quite clear from the record that the plaintiff had not prospered in Nebraska, and that this was perhaps the cause of the trip which the decedent made to the plaintiff's home about November 1, 1920. It is also a fair inference that while the decedent was at plaintiff's home on this trip, some arrangement was made between them for the plaintiff's return to Monona county, for the plaintiff did have a sale of most of his personalty in February 1921, and did return to Monona county, shortly thereafter, to the home of the decedent on the quarter section farm, where he remained with his family, until a new residence was completed on an 80-acre tract, owned by the decedent, and lying immediately south and across the road from the quarter section, to which the plaintiff and his family then moved. Decedent and his wife remained on the quarter section until the wife died on December 15, 1921, at which time, or shortly thereafter, the plaintiff and his family returned to the decedent's home. There is evidence that this arrangement was not so agreeable, and in August 1923 the decedent married a widow, an elder sister of plaintiff's wife. Decedent then purchased the residence property in the town of Whiting and he and his wife lived there until his death.

During the years 1922 and 1923, the 80 acres was occupied and farmed by another tenant. Later, and the record does not show just when, the decedent sold the 80-acre farm. Although the decedent lived in Whiting he personally managed and supervised the farm operations, and did much work and spent much time at the farm. Under the arrangement the plaintiff and decedent divided the income from the stock and crops equally.

The only real issue in the case is whether the alleged oral contract was established. The only direct proof of the contract is the testimony of the plaintiff's wife. There is, however, the type of corroborative evidence, usual in such cases, consisting of testimony of witnesses as to declarations of the decedent supporting the plaintiff's contentions. With respect to the direct proof of the contract, it appears that, at the time thereof, the decedent arrived at the plaintiff's home in Nebraska Friday evening and remained until about noon on the following Monday; that, after breakfast, and while the plaintiff's wife was washing the dishes and doing the kitchen work incidental thereto, her husband and the decedent were seated at the table in the room, and she overheard all of their conversation, but took no part therein; that decedent told her husband that he had a proposition to make to him, and if he was interested alright and that if he was not interested it was alright; that he and Edith (his then wife) were in such financial condition that they did not have to work so hard, and that if they were ever going to have a vacation it was time they were doing it; that decedent then said:

"If you will sell out and move to Iowa, help carry on the business of the farm, help carry on the work of the farm, that it will in the course of time when we are done with it, be yours."

She further testified that decedent said that they would tear down the old house on the eighty and build a new one, and that he asked my husband if he would come and my husband told him that he would. She also testified: "Before Mr. Harrison left that morning to catch his train he asked

me if those plans were agreeable to me." She testified that her husband was to farm both the quarter section and the eighty, and that these were the farms that were spoken of in the agreement, and that decedent said: "After such time as Edith and I are through with it, it will be all yours."

On cross-examination, she testified that when the last quoted remark was made, her husband asked when that time would be, and the decedent said: "When I die." She said that she heard all of the conversation and that when the decedent asked her if she agreed to this proposition she knew the arrangement he referred to, and she replied that she was willing to go. On further cross-examination, she testified that she understood the farm that was meant "was what was left", as Mr. Harrison said: "Whatever land there is left that has been Edith's and mine will be yours;" that she thought Mr. Harrison meant the home farm (the quarter section) "although he didn't designate what farm he was talking about."

It will be noted that there is some indefiniteness as to just what land was covered by the alleged contract, and that it is not entirely clear whether it was to pass to the plaintiff on the death of Harrison or on the death of both Harrison and his wife.

Appellees objected to and moved to strike all of the testimony of the plaintiff's wife relative to the conversation between plaintiff and decedent, upon the ground that both the witness and the testimony were incompetent under Code section 11257, since the witness took part in the conversation. Under the record we cannot definitely say that the question of Harrison and the answer of the witness respecting her consent to the proposed arrangement, was a part of the conversation between plaintiff and decedent, or some time later. The record indicates that it was later. For the purpose of this case we have considered the testimony.

It was, of course, impossible for the defendants to refute directly either the testimony of the plaintiff's wife as to the conversation, or the testimony of plaintiff's other witnesses as

to subsequent declarations of the decedent. However, there was evidence, mostly undisputed, of conduct on the part of the plaintiff, which weakens all of this testimony.

■ There is no evidence that the plaintiff ever again discussed the proposition with decedent, after it was first allegedly discussed in Nebraska. Neither is there any evidence that the plaintiff or his wife ever made or mentioned any such claim or arrangement prior to the death of Harrison. Plaintiff appears to have been a person of average intelligence, and it was his understanding that it was necessary that Harrison should make a will to carry the agreement into effect, and it is significant that he never made any effort to procure some proof by written contract, or by a will, to evidence or to safeguard his rights. Neither did he ever make any attempt, after the alleged arrangement was made, to definitely inform himself of his rights and what was necessary to protect them. It appears reasonable that if such an agreement had been made, and had been performed on his part, that on the death of Harrison he would have said something about it. But he did not. An administrator was appointed who checked over and listed the personal property with the plaintiff, and the latter claimed just half of it, and made no mention of the alleged agreement. The administrator told him that he could not go on with just a verbal lease, as Harrison had done, and that there would have to be a written lease for the coming year, and one was executed by plaintiff and the administrator on March 11, 1938. It would seem that at such a time the plaintiff would have asserted the claim which he now makes. But he did not. The administrator sold the farm under contract for $18,000 and received a down payment. Plaintiff knew of this and yet said nothing about his claim. The administrator testified:

"In August of 1938 Alvin [the plaintiff] asked me to rent the farm to him providing it wasn't sold. I told him we were going to sell the land, that the farm was in good condition and the buildings in good shape and we wanted to sell it before it began to go down. He didn't say it was his.

I told him he could stay if it wasn't sold. He told me I might sell the land to Jim Hennum at Sloan and if I did, that he could continue to rent the farm.''

The plaintiff did not deny this testimony.

The surviving widow testified that she overheard a conversation of her husband a day or two before he died that he didn't owe the plaintiff a dollar, that he had paid him for every day's work he had ever done and that he didn't intend to leave him any of his property. She testified that after her husband's death the plaintiff asked her to give him the farm machinery and the livestock, and that his wife had asked her to convey her interest in the farm to them, but that neither the plaintiff nor his wife had ever at any time made any claim to any of the property as a matter of right, or on the basis of any contract such as the one sued upon. There was no denial of this testimony. The defendants offered other testimony of a similar nature but it was mainly from persons more or less interested in the property. A brother and sister of the deceased and a brother of the plaintiff assigned their interest in the farm to the plaintiff. A witness testified that plaintiff had asked him to try to persuade another brother of decedent to assign his share to the plaintiff, but on being asked whether the decedent had ever said that he should have the property, he replied that he had not. The plaintiff denied that he told this witness that decedent had never said that he should have the property, but he did not testify that he told the witness that there was any such agreement, but he admitted that on this occasion he had told the witness that ''three of the heirs had assigned their shares to me and I asked him if he would care to suggest to George Harrison *that it would be nice if he did the same thing.''* There was some testimony that there was some report in the community that the plaintiff would be left the farm.

Eight or nine witnesses testified to conversations had with the decedent at different times in which he said with reference to the plaintiff: ''the farm is his when I am done with it;''

"he is ours and what we have got is his when we die; when we are through with it; I told him he could have this place when I died if he would come back and stay with me;" "the farm will belong to the boy [he was then 58 years old] when I am through with it;" "that when he was through, which I take that he meant when he died, the home place would be Alvin Williams'"; "Alvin will probably live and die where he is at;" "when we are done with it it is his anyway;" and "he said that Alvin was the only heir that he had." The circumstances of a number of these claimed statements detract from the weight of the testimony.

Plaintiff testified that during or shortly after November 1938, while in the office of one of his attorneys, he saw what was apparently an advance sheet of the Northwestern Reporter, showing the case of Ford v. Young, 225 Iowa 956, 283 N. W. 324, which he read "and it seemed to be a good case." Just before the Christmas season of 1938 he instituted this suit. He gave as his reasons for his delay, and his failure to make known his claim earlier, that he did not know what his rights were until he had consulted a lawyer.

It has always been the holding of this court, and of the courts generally, that claims of this kind should be scrutinized with the greatest care, and established only upon the most satisfactory evidence.

Of testimony of the kind set out above relative to statements of a deceased declarant, this court has said:

"But such declarations, like other admissions, are generally regarded as unsatisfactory evidence on account of the ease with which they may be fabricated, the impossibility of contradiction, and the consequences which the slightest mistake or failure of memory may produce." Ellis v. Newell, 120 Iowa 71, 73, 94 N. W. 463. "Such declarations of a deceased person, testified to by witnesses who say they heard them many years before their testimony is given, are entitled to very little weight." Boeck v. Milke, 141 Iowa 713, 718, 118 N. W. 874, 876, 120 N. W. 120. "It has long been recognized in this state

that testimony of this character is not very persuasive in its probative force." Sharpe v. Wilson, 181 Iowa 753, 768, 161 N. W. 35, 40.

The high degree of proof necessary to establish a claim such as the plaintiff makes, or claims of a kindred nature has been expressed by this court in varying language, but always to the same point, as the excerpts from the following decisions, indicate, to wit: "clear and satisfactory proof", Johnston v. Johnston, 19 Iowa 74, 81; Runnels v. Anderson, 186 Iowa 1370, 1380, 173 N. W. 91, 94; "clear and unequivocal", Bevington v. Bevington, 133 Iowa 351, 358, 110 N. W. 840, 843, 9 L. R. A., N. S., 508, 12 Ann. Cas. 490; "clear, unequivocal and definite", Truman v. Truman, 79 Iowa 506, 510, 44 N. W. 721, 722; Chew v. Holt, 111 Iowa 362, 364, 82 N. W. 901; Williamson v. Williamson, 4 Iowa 279; "direct, positive, express, and unambiguous", Wilson v. Wilson, 99 Iowa 688, 692, 68 N. W. 910, 911; "clear, definite, and conclusive", McDonald v. Basom, 102 Iowa 419, 421, 71 N. W. 341, 342; Briles v. Goodrich, 116 Iowa 517, 518, 90 N. W. 354, 355; Boeck v. Milke, supra; "clear, substantial and convincing," Long v. Kline, 222 Iowa 81, 83, 268 N. W. 150, 151; "clear, cogent, and convincing," Black v. Nichols, 213 Iowa 976, 982, 240 N. W. 261, 263; "clear, satisfactory, and convincing;" Stiles v. Breed, 151 Iowa 86, 91, 130 N. W. 376, 378; Sharpe v. Wilson, 181 Iowa 753, 756, 161 N. W. 35, 36, supra; Ford v. Young, 225 Iowa 956, 966, 282 N. W. 324, 329. In Blezek v. Blezek, 226 Iowa 237, 241, 284 N. W. 180, 182, the court, after referring to Ford v. Young, supra, said: "We have recently reviewed our cases that point out the necessity that the evidence to establish an alleged oral contract, such as we are considering, be clear, satisfactory and convincing, and that say it is the special duty of the court to subject such evidence to every fair test which may tend to weaken its credibility."

The trial court, who had all of the witnesses before him, and who was in a better position than we to pass upon their credibility and the weight of their testimony, found that the

plaintiff had "failed to establish by clear, substantial, satisfactory and convincing evidence the oral contract alleged by him."

There is substantial evidence to support this finding, and our judgment is that the decree of the trial court should be, and it is, affirmed.—Affirmed.

HAMILTON, C. J., and RICHARDS, SAGER, STIGER, MITCHELL, HALE, and MILLER, JJ., concur.