LILLIAN ABEL, appellant, v. CHARLES K. ABEL et al., appellees.

No. 48458.

(Reported in 65 N.W.2d 68)

June 15, 1954.

Life & Davis, of Oskaloosa, and Frank Beatty, of Sigourney, for appellant.

Goeldner & Goeldner, of Sigourney, for appellees.

THOMPSON, J.—Plaintiff's petition was brief. It alleged her ownership of real estate described as the Southeast Quarter of the Southeast Quarter of Section 15, Township 74 North, Range 13, West of the Fifth P. M., in Keokuk County; that the defendants or some of them make some claim adverse to the estate of the plaintiff, by will or inheritance; and said claim is without foundation in fact or in law.

Charles K. Abel, apparently the only defendant who appeared, answered denying plaintiff's ownership and alleging that he owned the described real estate by virtue of being the sole beneficiary under the will of John W. Abel, Sr., who died seized thereof. By way of cross-petition, he alleged in Division II his ownership of the realty through the will, and in paragraph 2 pleaded that plaintiff makes some claim adverse to the title of the defendant; "that plaintiff claims title to said real estate by deed." He prayed that his title be established and quieted against plaintiff. Division III of the answer and cross-petition likewise alleged defendant's ownership and attempted to plead title by adverse possession, and an estoppel against plaintiff through laches. We think he proved the allegations of Division II, and no further attention will be given to Division III.

By way of reply to the cross-petition, plaintiff admitted the allegations of paragraph 2 of Division II and denied the other allegations of Divisions II and III. Some allegations of the reply were stricken out upon motion. This ruling of the court is the subject of one of the propositions relied upon for reversal and will be considered and the relevant facts further stated later in this opinion.

John W. Abel, Sr., and Amanda B. Abel were husband and wife and were the parents of George C. Abel and John W. Abel,

Jr. The defendant Charles K. Abel is the son of John W. Abel, Jr. The plaintiff, Lillian Abel, is the widow of George C. Abel. In the year 1892 John W. Abel, Sr., acquired title to the real estate in controversy, and he held record title at the time of his death on October 26, 1948. His will, dated November 1, 1947, which was duly admitted to probate in Keokuk County, and has not been directly challenged, named Charles K. Abel as sole beneficiary.

On October 16, 1897, John W. Abel, Sr., was adjudged to be insane and was committed to the state hospital at Mount Pleasant. He remained there until late in the year 1929, when he was paroled. A guardian was appointed for his property at that time, but on March 12, 1930, the district court of Keokuk County adjudged him to be sane and the guardian was discharged.

The wife and two sons remained in possession of the property of the father. He owned at the time, in addition to certain personalty, the forty acres involved here, and two adjacent forty-acre tracts. The wife and sons lived on one of these other than the parcel in question and farmed the entire one hundred and twenty acres, paying off a mortgage and apparently making their living. Amanda B. Abel, the wife of John Sr. and the mother of George C. and John W. Jr., died about 1917. Shortly thereafter the two sons, George C. and John W. Jr. made a division of assets. No administration was had on Amanda B. Abel's estate. It is suggested she owned some personalty at the time of her death. But the two sons, her sole heirs and who were except for the dower rights of their father and the claims of creditors entitled to such estate as she left, proceeded to distribute not only her property but the real estate of their insane father as well. John W. Abel, Jr., got most of the personalty and one of the three forty-acre tracts. George C. Abel got the other two forty-acre parcels, including the one whose title is now disputed. The brothers, ignoring their father's title and ownership, exchanged quitclaim deeds to the real estate in an apparent effort to give some color of legality to their division of property belonging entirely to another. Again it is suggested they did not expect their father would ever be adjudged sane or released from the state hospital.

The brothers proceeded to take possession of the respective pieces of land involved in their conveyances. The forty acres with which we are concerned was unimproved, and in fact had no buildings or other improvements until a small house and barn and some outbuildings were placed thereon by John W. Abel, Sr., at sometime during the 1930s. George C. Abel, however, farmed the tract and paid the taxes upon it from 1917 until about 1930. It is to be assumed, since the record does not show otherwise, he took the proceeds of the land as his own.

Upon the release of John W. Abel, Sr., from the hospital and the subsequent finding of his competency in 1930, he seems to have raised the question of his right to the land from which his sons had so summarily attempted to dispossess him while he was under adjudication of insanity. Apparently he employed Robert J. Shaw, a well-known attorney at Sigourney; and at sometime during the years 1930, 1931 or 1932, the date being extremely vague in the record, a conference took place at the home of George C. Abel on the forty-acre tract, other than the one in question, which had been quitclaimed to him by John W. Abel, Jr. It appears that this forty acres was later conveyed to George by John Sr., and so no question as to its ownership has arisen.

Since John W. Abel, Sr., George C. Abel and Robert J. Shaw were all deceased at the time of the trial, we have only the testimony of the plaintiff, her sister, Rose McBurney, and one Clarence Foudree, who lived for many years in the home of plaintiff and her husband, as to what was there said and done. We shall discuss this in detail later. Shortly after this conference, John W. Abel, Sr., took possession of the disputed tract. He moved a small house upon it and improved it with a barn and outbuildings. He had possession until the time of his death, farming it and paying taxes and other expenses. George C. Abel died in 1947. Sometime before his death he executed a quitclaim deed to the forty-acre tract in question to his wife, the plaintiff, Lillian Abel, and it is through this deed and such rights as George C. Abel had she claims ownership. The trial court determined the issues in favor of the defendant.

I. The major contentions of the plaintiff upon her appeal

are three: (1) that her immediate grantor, George C. Abel, became the owner of the disputed tract by virtue of a contract, either oral or written, with John W. Abel, Sr.; (2) that there being a dispute between George C. Abel and John W. Abel, Sr., concerning the ownership, they settled and compromised their differences by this agreement, either oral or written, by the terms of which John W. Abel, Sr., was given possession for his life, ownership to remain in or to revert to George C. Abel thereafter; and (3) that George C. Abel became the owner by adverse possession.

The first two contentions are in effect the same. If any contract, either written or oral, was made between the father and son concerning this land, there was no more than one. Whether it was a direct agreement that George was to have title upon his father's death, or whether it was the same agreement in settlement of conflicting claims to the land is immaterial. The only difference is in the alleged consideration. Since there is no evidence in the record of any contract concerning the land in question except on the one occasion during or shortly after the year 1930 when the parties met at the home of George C. Abel, plaintiff's rights must be supported by what was said and done there, if at all; and it matters not whether the consideration for the agreement which it is claimed vested title in George C. Abel was a compromise and settlement of a bona fide dispute or some other quid pro quo. The rules governing situations where it is sought to divest a legal title by parol evidence apply in either event.

It is not clear whether the plaintiff is relying, at this point, upon a written contract or an oral one. But however this may be, the record shows she must depend upon oral testimony. Upon a date not definitely specified, but which seems to have been within from six months to two years after John W. Abel, Sr., was found sane after his return from the Mount Pleasant hospital, plaintiff says he came to the home of her husband, George C. Abel, and herself, with his attorney, Robert J. Shaw. Present, in addition to the parties named, were plaintiff's sister, Rose McBurney, and one Clarence Foudree, who had lived in the George C. Abel home from the time he was fifteen years old

until he became an adult. She says: "Well, Mr. Bob Shaw he came over there and brought George's father with him * * *. We were all out in the yard, and they began talking about, Bob Shaw said he wanted to see George about turning or .letting his father use, have the use of the land and so——Q. What land do you refer to? A. That forty acres. Q. That is the subject matter of this——A. Yes, that's right. * * * He [Mr. Shaw] said he asked George if he would be willing to let his father take the 40 acres over and farm it and keep the taxes up on it as long as he lived and then he would turn it back to George, it would be George's the same as before. Q. Did your husband make any reply? A. He said it would be all right with him. * * * Q. What did John Abel say at that time if anything * * * if he said anything? A. He said that he would be willing to do that and he would leave it just like it was after he got through with it."

The witness then further said that Mr. Shaw had a paper with him and "I think George signed it. I don't know whether my father-in-law signed it. I didn't stay out you know. Mr. Shaw was talking to George about the paper. Q. What did he say about the paper to George if you know? A. Well, I don't remember just what he said." She then testified she did not have a copy of the paper; she had tried to find it but had not succeeded. Rose McBurney testified as to this writing: "Mr. Shaw had a paper with him. . I believe somebody signed it, but I couldn't say. I believe it was John." Clarence Foudree, the third living person who claims to have been present, says only as to the paper, that Mr. Shaw had a paper with him that he observed; that he did not know what was done with it.

It is so clear as to require no comment that plaintiff has no case upon a written contract. There is no substantial evidence it was ever signed by John W. Abel, Sr., and there is no evidence as to its contents. No written contract has been proven.

Turning again to the matter of the alleged oral agreement under which it is claimed either that George C. Abel's title to the land was recognized and affirmed by his father, or that a binding agreement was made that he should become the owner upon his father's death, we have set out plaintiff's own version

above. Rose McBurney was asked first: "Now I will ask you if at that time you heard any conversation in regard to this forty acres which is now in controversy here? A. There were." It will be noted the witness was not asked to describe what particular tract was referred to; the question was leading and she merely assented. She further testified: "* * * Mr. Shaw asked Mr. Abel if he was willing to farm the land and keep up the taxes and he said he was, and return it back to George and then he asked George if that was satisfactory with him and it was. * * * Q. Did he [Mr. Shaw] say how long John Abel Sr. would farm it? A. The remainder of his days, as long as he lived." The witness repeated these statements in substance later. Clarence Foudree, who lived in the George C. Abel home from his fifteenth year until he was married, also testified. His attention to the particular land involved was called by a leading question: "Q. Did you hear a conversation at that time in reference to this 40 acres of land that is in controversy here? A. Yes, I did." His version of the conversation was this: "Well, the conversation was regards to the 40 acres that John Abel was to farm it, was to take the 40 acres and farm it and it was to be returned to George and his wife." He then said that both George and John said it was agreeable with them.

Andrew A. Williams, a neighbor living not far from the land in dispute, testified as to a conversation with John W. Abel, Sr., at a date he was unable to fix. The witness said: "He told me, he said he was farming, he was talking about his farming and what he had, shape his place was in and he says the boys had fixed the land to suit theirselves and he said it is all right with me as long as I have got a home and farm and what little I have. * * * He said he was to have the use of it as long as he lived, just the boys agreed on that was all right. The boys always got along so far as I know and they had fixed the land the way they wanted, to the way their father talked * * *."

There is some testimony from the plaintiff concerning a payment of $550 which she made to Mr. Shaw, which she thought might have been in connection with a claim made by Keokuk County against John W. Abel, Sr., for reimbursement for his support in the state hospital. She is extremely vague as to this,

however, and admits it may have been a payment to Mr. Shaw for attorney fees. It had no real bearing upon the question of the claimed oral agreement, and her case must stand or fall so far as any contract is concerned upon the testimony of herself, Rose McBurney, Clarence Foudree, and Mr. Williams. This we must examine in the light of our decisions in similar cases. There is some testimony that John W. Abel, Sr., expressed his approval when he learned George had deeded the land to his wife, the plaintiff herein; but there is also substantial evidence he expressly disapproved. There is also evidence of statements made by him inconsistent with the claimed agreement. He made substantial improvements upon the realty.

The burden resting upon one who, after the death of the holder of the legal title to real estate, seeks to establish ownership through a claimed oral agreement with the deceased is a heavy one; and rightly so. The ease with which evidence of oral statements of one since deceased may be fabricated, misconstrued, slanted or colored is so apparent that the courts will accept nothing less than proof so clear and convincing as to leave no substantial doubt as to its terms. In Sharpe v. Wilson, 181 Iowa 753, 756, 161 N.W. 35, 36, we said: "Other courts hold that the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character." This was quoted with approval in Swan v. Johnson, 229 Iowa 1144, 1150, 296 N.W. 214, 217. The question of the degree of proof required in this class of cases was discussed at some length in Williams v. Harrison, 228 Iowa 715, 723, 293 N.W. 41, 44, and in many other authorities cited therein.

A collateral rule is that evidence of claimed admissions, particularly when given by relatives or close friends of the party who attempts to assert ownership resting upon an oral agreement is not of high order, is suspect, and should be closely scrutinized. We quote from Wagner v. Wagner, 208 Iowa 1004, 1009, 224 N.W. 583, 585, 586: "The testimony of declarations and admissions made by Ellen and John Wagner and all conversations overheard between them is not of a high order. It is subject to the fallibility of human memory and judgment. Its accuracy cannot be depended upon. It is true that many of the

witnesses were relatives, or intimate friends, and may well be presumed to have had, if not a direct, a sympathetic, interest in the matter."

In the recent case of Bell v. Pierschbacher, 245 Iowa 436, 444, 62 N.W.2d 784, 789, is a similar statement: "We have repeatedly pointed out that evidence of claimed oral statements of a decedent should be closely scrutinized and cautiously received because it is not susceptible of denial and the witness may not have been capable or desirous of accurately relating what decedent may have said." The cases in which this rule has been announced and followed are legion, and further discussion or citation of authorities would serve only to needlessly encumber this opinion.

The evidence adduced for the plaintiff concerned a supposed oral conversation held some twenty years before the time of the trial. It came from the plaintiff herself, her sister, and a young man who was in effect a foster son. Counsel, by directing the attention of the witnesses to the land in controversy by a leading question, leaves some doubt as to whether they knew or could have testified exactly to what realty the conversation concerned. It must be remembered that not long afterward John W. Abel, Sr., did in fact deed over to his son George the other forty-acre tract which the latter had appropriated to himself while his father was confined in the hospital for the insane, and it is possible the conversation may have dealt with that parcel. Mr. Shaw, an attorney of standing, can hardly be presumed to have been a party to leaving the ownership of valuable real estate to rest upon a verbal agreement, known to every lawyer to be a prolific source of controversy and litigation. The testimony offered by the plaintiff seems to indicate that the real agreement was to be in writing, and the conversation was merely a preliminary discussion before the signing of the written contract. But the terms of the writing are not before us, and we cannot supply them. Here again the plaintiff encounters, and fails to overcome, a need for clear, convincing and satisfactory proof. In Forrest v. Otis, 224 Iowa 63, 67, 276 N.W. 102, 104, 105, we quoted with approval this statement from Tayloe v. Riggs, 1 Pet. (U. S.) 591, 598, 600, 7 L. Ed. 275, 279:

"When a written contract is to be proved, not by itself, but by parol testimony, no vague uncertain recollection concerning its stipulations ought to supply the place of the written instrument itself. The substance of the agreement ought to be proved satisfactorily; * * *. The safety which is expected * * * would be much impaired, if they could be established upon uncertain and vague impressions made by a conversation antecedent to the reduction of the agreement."

Unless we are to understand plaintiff claims the oral testimony of herself, her sister, and her foster son is intended as proof of what was in the supposed written contract which Mr. Shaw produced, we have no evidence whatever of its contents. If she does so claim, there is a lack of the required definiteness, and there is no evidence it was signed by John W. Abel, Sr. If she rests her case upon an alleged oral agreement, and regardless of the purported consideration, it is not supported by the kind and quantum of proof required in such cases.

II. The claim of ownership by adverse possession encounters many insurmountable obstacles. In the first place, there is no indication this claim was ever presented to the trial court. Its findings do not indicate it was considered. In her reply plaintiff admitted she claimed under a deed. But, passing that point, it is evident the prescriptive right claimed must have arisen, if at all, in the period from 1917, when George C. Abel received and recorded the quitclaim deed from his brother, until 1930, when his father was declared competent and shortly thereafter regained possession. No such rights could have accrued thereafter, since John W. Abel, Sr., lived on the property and had full possession until his death. We make no determination upon the question whether a quitclaim deed from one having no title or ownership may form a basis for a claim of possession under color of title.

But we think no ownership by adverse possession could have been acquired by George C. Abel while his father, the holder of the legal title, was under adjudication of insanity. A prescriptive right arises upon the theory of a grant by the

titleholder; that is to say, it is assumed through long and hostile possession under claim of right or color of title that the occupant holds under a grant from the former owner. But an insane person cannot make a valid grant. The reason for the theory of prescriptive rights fails when the holder of the legal title was at the time of the taking of possession by the claimant and throughout the running of the time required incompetent to make a conveyance. 1 Am. Jur., Adverse Possession, section 19, and cases cited; 2 C. J. S., Adverse Possession, section 5, pages 514, 515; Callison v. Wabash Railway Co., 219 Mo. App. 271, 275 S.W. 965, 969.

An allied rule is that the true owner must have knowledge, actual or constructive, of the hostile possession. 2 C. J. S., Adverse Possession, section 45, pages 558, 559. No presumption of a grant may arise when the titleholder had no knowledge or means of knowledge of the possession and of the claim being made. It is evident that an insane person, confined in a state hospital some distance from the land, could not be charged with such knowledge.

The running of the statute is tolled when the owner is insane at the time of the commencement of the possession alleged to be adverse to him, at least for so long as such insanity continues uninterrupted. 44 C. J. S., Insane Persons, section 105, and cases cited in notes 75 and 76 thereunder; 1 Am. Jur., Adverse Possession, section 22.

Again, we have said the holding must be in good faith. There must be a basis for the claim. In McFerrin v. Wiltse, 210 Iowa 627, 631, 231 N.W. 438, 440, we said: "No basis for his asserted claim of right is shown. Independent of any title based on the theory of accretions, appellee knew he possessed neither title nor right to the land."

In Roth v. Munzenmaier, 118 Iowa 326, 330, 91 N.W. 1072, 1073, the need for good faith is recognized by this language: "The deed, although made by one having no authority to convey, is sufficient to support a claim of adverse possession, *provided such possession is in good faith.*" (Italics supplied.)

The necessity for good faith was impliedly held in Vander Zyl v. Muilenberg, 239 Iowa 73, 80, 29 N.W.2d 412, 415, when

920

we said: "* * * the entire record satisfies us of the good faith of his claim * * *." See also Meyers v. Canutt, 242 Iowa 692, 46 N.W.2d 72, 24 A. L. R.2d 1.

It is evident the claim and possession of George C. Abel could not have been in good faith. There was no reason why he and his brother should believe they had any right to divide and apportion between themselves the real estate of their father while he was an insane patient in the state hospital. They must be held to have known the quitclaim deeds they exchanged gave them no title. At best, they proceeded upon what proved to be an unfounded assumption that their father would never be discharged from the adjudication of insanity. No claim of ownership by adverse possession will be sustained upon such a foundation. Plaintiff's position at this point does not appeal to a court of equity.

III. Error is predicated upon a ruling of the trial court in sustaining defendant's motion to strike certain allegations from plaintiff's reply to the cross-petition. The first three paragraphs of the motion might well have been denied. But the matter stricken by granting them did not alter the issues in the case. The allegations removed were that plaintiff was the absolute owner of the real estate; that John W. Abel, Sr., did not die seized of it; and that an agreement had been made between John W. Abel, Sr., and his two sons which made the sons owners of forty acres of land each. All of these matters remained in the case and were fully tried. No prejudice resulted to the plaintiff. The ruling sustaining paragraph 4 of the motion to strike removed an incomplete allegation apparently intended to set up adverse possession. The pleading was defective, and in any event we have seen that the claim of prescriptive right could not be sustained.

The remaining allegations stricken from the reply by the court's ruling contained charges, stated several times and in various ways, that the will under which the defendant claimed title was the result of undue influence exercised by him upon John W. Abel, Sr., and was the defendant's will rather than that of the purported testator. There is also an allegation John W. Abel, Sr., was mentally incompetent to make a will.

The will had been duly admitted to probate and stood as a verity. A will so admitted cannot be collaterally attacked in this manner. It stands as any other judgment of the court. In re Estate of Huston, 238 Iowa 297, 27 N.W.2d 26.

■ There was also an allegation that the father of the defendant, John W. Abel, Jr., "has kept and retained the said real estate transferred and given to him by John W. Abel, Sr., at the time the said John W. Abel, Sr., gave the real estate, the subject matter of this action to John W. Abel Jr., (sic), the husband of this plaintiff." It is evident the final reference was intended to be to George C. Abel. The matter was entirely irrelevant and was properly stricken.

IV. Plaintiff's final proposition relied upon for reversal is stated thus: "That by the written contract between John W. Abel Sr. and George C. Abel, the acceptance of the benefits thereof and acting thereon, John W. Abel Sr. was and those claiming by, through or under him are estopped from claiming title to the real estate the subject hereof."

■ Except, possibly, for some attempts to set up an estoppel in her reply in connection with allegations of undue influence in procuring the execution of the will, which we have held were properly stricken, there was no pleading of estoppel by the plaintiff. We have repeatedly said estoppel must be pleaded before it is available. Mensinger v. Hass, 240 Iowa 71, 79, 35 N.W.2d 461, 465; In re Trust of Lunt, 235 Iowa 62, 80, 16 N.W.2d 25, 34. And, since the estoppel urged upon us by the assignment of error above set out depends upon the existence of a written contract, which we have held was not proven, it is equally apparent there was no estoppel arising from it.

We hold the trial court's decree and judgment was in all respects just and free from error.—Affirmed.

All JUSTICES concur.