**IN THE COURT OF APPEALS OF IOWA**
No. 19-2114
Filed January 21, 2021

**STEVEN SCHUELLER,**
    Plaintiff-Appellant,

**vs.**

**ALLISON GILLIES and STONE HILL COMMUNITY ASSOCIATION,**
    Defendants-Appellees.
_____


Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.


Steven Schueller appeals the district court's order denying his action to quiet title and entering a money judgment in favor of Stone Hill Community Association. **AFFIRMED.**


Christopher C. Fry and Alyssa M. Carlson of O'Connor & Thomas, P.C., Dubuque, for appellant.

Chadwyn D. Cox of Reynolds & Kenline, L.L.P., Dubuque, for appellee Stone Hill Community Association.

Jason D. Lehman of Lehman Legal, PLC, Dubuque, for appellee Allison Gillies.


Considered by Bower, C.J., and May and Ahlers, JJ.

**MAY, Judge.**

Steven Schueller appeals the district court's order denying his action to quiet title and entering a money judgment in favor of Stone Hill Community Association (Stone Hill) for unpaid assessments. We affirm.

## I. Background Facts and Prior Proceedings

In 1978, Schueller married Allison Gilles. A few months later, they purchased a townhouse together. It is located within the Stone Hill Community in Dubuque, Iowa.

In 1983, they moved to Arkansas with their children. And Schueller rented out the townhouse. Around 1990, Schueller's parents moved into the townhouse and paid Schueller rent. Schueller's parents also paid annual and special assessments to Stone Hill as needed.

Around 1995, Gillies moved back to the Dubuque area. She testified that, while she was aware she had an ownership interest in the townhouse, "[m]y in-laws were living there, and I did not feel it was decent to remove two elderly people from their home." Occasionally, she would visit the townhouse so the children could visit their grandparents. But she never resided at the townhouse after the family moved to Arkansas in 1983.

After approximately four years of separation, Gillies and Schueller divorced in 1999. The divorce decree declared Gillies and Schueller tenants in common to the townhouse. In 2000, Schueller's father died. And in 2011, Schueller's mother died. After 2011, no one resided in the townhouse, although Schueller stayed there when he made visits to Dubuque. Schueller testified at trial that his visits to

the Dubuque area became less frequent because his "health dwindled" and he "was no longer able to make the trip."

During their marriage, Schueller paid all bills related to the townhouse. Gillies did not have any involvement in the family's financial matters or management of the townhouse. Likewise, after their divorce, Gillies was not involved in the financial matters or management of the townhouse. Gillies did not receive any rent payments from Schueller. Nor did she pay any bills related to the townhouse. Rather, Schueller continued to pay all bills related to the townhouse after the divorce, including paying off the remainder of the mortgage amounting to approximately $50,000.

But after his mother's death in 2011, Schueller did not pay assessments to Stone Hill. Schueller took the position that he was not required to pay the assessments because Stone Hill's covenants had expired. In 2012, Stone Hill brought the matter to small claims court to collect unpaid assessments for 2011 and 2012.[1] The magistrate agreed with Schueller and dismissed the case.[2] Stone Hill did not appeal.

---

[1] The 2012 small claims court case lists only Schueller as the defendant. Until 2018, Stone Hill believed Schueller was the sole owner of the townhouse. A representative for Stone Hill testified it was not aware whether Gillies was deceased or divorced from Schueller.

[2] The small claims court found:

> [T]he 1976 restrictive covenants expired in 1997 pursuant to Iowa Code section 614.24 [(2012)]. The restrictive covenants executed in 1998 did not extend the 1976 covenants as they were not filed within twenty-one (21) years. In addition, the 1998 restrictive covenants were not signed by [Schueller] and therefore are not applicable to his property.

In 2018, Stone Hill learned that Gillies lived in the area and was still co-owner of the townhouse. In 2019, Stone Hill sent Gillies a substantial bill for unpaid assessments. The bill prompted Gillies to file a petition for partition of the townhouse. Schueller answered and pled an affirmative defense of adverse possession. He also filed a petition to quiet title on the townhouse in his favor. Stone Hill intervened to collect unpaid assessments accrued from 2013 to 2019.

The district court (1) concluded Gillies and Schueller own the townhouse as tenants in common, (2) granted Gillies's partition claim, (3) ordered Schueller and Gillies to take reasonable steps to sell the townhouse and then share the net sale proceeds, (4) rejected Schueller's claim of adverse possession and, therefore, denied his action to quiet title to the townhouse, and (5) granted judgment in favor of Stone Hill and against Schueller and Gillies equally for $24,652.44 in unpaid assessments. Schueller now appeals.

## II. Standard of Review

The district court tried the case in equity. So we review all claims de novo. Iowa R. App. P. 6.907 ("Review in equity cases shall be de novo."); *In re Coe Coll.*, 935 N.W.2d 581, 586 (Iowa 2019) ("[A]n action tried wholly in equity will be subject to a de novo standard of review . . . ."); *Johnson v. Kaster*, 637 N.W.2d 174, 177 (Iowa 2001) ("Generally, we will hear a case on appeal in the same manner in which it was tried in the district court."); *Davis-Eisenhart Mktg. Co. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995) ("[W]e ordinarily hear cases on appeal in the manner in which they were treated in district court."); *Citizens Sav. Bank v. Sac City State Bank*, 315 N.W.2d 20, 24 (Iowa 1982) ("[W]e will consider and review a case on appeal in the manner it was treated below."). But, to the extent this case turns on

interpretation of a statute, our review is for errors at law. *Estate of Cox v. Dunakey & Klatt, P.C.*, 893 N.W.2d 295, 302 (Iowa 2017).

**III. Analysis**

Schueller claims the district court erred in (1) finding he failed to meet the elements of adverse possession and (2) awarding Stone Hill unpaid assessments accrued from 2013 to 2019. We address each claim in turn.

**A. Adverse Possession**

"A party claiming title by adverse possession must establish hostile, actual, open, exclusive and continuous possession, under claim of right or color of title for at least ten years." *C.H. Moore Tr. Est. v. City of Storm Lake*, 423 N.W.2d 13, 15 (Iowa 1988). "The burden is on the plaintiff to show all the elements of adverse possession by clear and positive proof." *Louisa Cnty. Conservation Bd. v. Malone*, 778 N.W.2d 204, 207 (Iowa Ct. App. 2009). But our analysis shifts slightly where, as here, the adverse possession involves tenants in common.

> The possession of one tenant in common is presumed to be for the benefit of all, and will, in the absence of statute to the contrary, be regarded as the possession of all cotenants until rendered adverse by some act or declaration by [one tenant in common] repudiating their interest in the property. As between cotenants, the statute does not commence to run until there has been an ouster, actual or constructive, by the occupying claimant. Constructive ouster may be shown by evidence of possessor's hostile intent coupled with knowledge or notice thereof brought home to [the] cotenants. Such knowledge or notice may be shown by circumstantial evidence. Usually no equities exist in favor of one who claims property of another by adverse possession, and [their] acts are to be strictly construed. A family relationship among contending cotenants places a stronger burden of proof on those asserting adverse possession to show the necessary elements.

*Shives v. Niewoehner*, 191 N.W.2d 633, 635–36 (Iowa 1971) (citations omitted).

The first question in our analysis must be "whether there was such constructive ouster of [Gillies] as to start the statutory period." *Id.* at 636. To answer this question, we must determine whether Schueller had hostile intent and whether Gillies knew or had notice of Schueller's intent. *Id.*; *see also Lynch v. Lynch*, 34 N.W.2d 485, 490 (Iowa 1948) ("It is true that the possession of a tenant in common is not necessarily adverse to [their] co-tenant, but it can become such and is so regarded where the tenant in common holds possession under a claim of entire ownership, and the co-tenant has knowledge of such claim.").

In evaluating whether Schueller had hostile intent, we consider the fact that he paid the mortgage, taxes, insurance, and utilities; performed repairs and improvements; leased out the townhouse; and kept all rents and profits. *See Shives*, 191 N.W.2d at 636. But these circumstances alone are not determinative. *Id.* (collecting cases); *see also Schoonmaker v. Schoonmaker*, 133 N.W. 741, 743–44 (Iowa 1911) ("That he paid the taxes is of no significance for as tenant in possession taking the whole use and benefit of the land from year to year it was his duty to pay them."). And we note that Schueller and Gillies's division of tasks related to the townhouse remained essentially the same before and after their divorce took place.

Even so, Schueller claims we should find hostile intent because Gillies had no way to access the townhouse. On this point, Schueller relies on his own testimony that throughout the years he changed the townhouse's locks "a couple of times." But when asked why the locks were changed, Schueller testified the lock was changed once because "it began to malfunction." Schueller never testified that his intent in changing the lock was to prevent Gillies from accessing

the townhouse. *See Schoonmaker*, 133 N.W. at 743 ("[I]n order to make the possession adverse, it must be shown that the possession was with the intent to hold adversely, and such intent must be shown by acts calculated to exclude the cotenant." (citation omitted)).

Still, Schueller points out that he never gave Gillies a key to the townhouse and, so, she had no means to enter after their divorce. But after Stone Hill contacted Gillies regarding the unpaid assessments, she obtained a key to the townhouse from their daughter. And she proceeded to enter the townhouse once to briefly look around. Nothing in the record suggests that Gillies met any resistance during her visit. *Cf. Adams v. McIntosh*, No. 04-0227, 2004 WL 2168433, at *2 (Iowa Ct. App. Sept. 29, 2004) (finding hostile intent by a joint tenant where he "denied [the other joint tenant] access to the property, and physically removed her from the house when she entered without his permission"). And although Gillies did not always have a key to the townhouse, Schueller never told her she was not allowed inside. From our review of the record, it is not so much that Schueller denied Gillies access to the townhouse; it is more that Gillies lacked much of a reason to speak to Schueller or reenter the townhouse until she was contacted by Stone Hill.

So we struggle to see much evidence of hostile intent by Schueller. Nor does it appear Gillies had knowledge or notice of any (alleged) hostile intent by Schueller. *See Shives*, 191 N.W.2d at 636; *see also Abel v. Abel*, 65 N.W.2d 68, 74 (Iowa 1954) ("[T]he true owner must have knowledge, actual or constructive, of the hostile possession."). After their divorce, Gillies and Schueller essentially stopped all communication with each other. Gillies testified that she continuously

believed she held title to the townhouse with Schueller as tenants in common. And Schueller fails to pinpoint any particular evidence showing Gillies knew or had notice that Schueller intended to take the townhouse for himself. *See Schoonmaker*, 133 N.W. at 743.

Our supreme court has held that the burden to prove adverse possession against a cotenant is high, stating:

> As between tenants in common, acts and words which will amount to an ouster must not be of a doubtful character, but clear and unambiguous. The reason is that the possession itself is rightful, and does not imply adverse possession as would that of a stranger, so that the presumption of possession in recognition of the rights of cotenants must be overcome by acts and declarations clearly inconsistent therewith brought home to the cotenants. Any other rule would lead to gross injustice and enable a designing tenant in common to turn the kindness and forbearance of [their] cotenants into a means of depriving them of their equal interest in the common property without consideration.

*Id.* at 744 (quotation marks and citation omitted). We conclude Schueller has not met his burden. So we affirm the district court's denial of his adverse possession claim and petition to quiet title. And we also affirm the court's partition of the townhouse.

**B. Unpaid Assessments**

We turn next to Schueller's contention that the district court erred by entering judgment in Stone Hill's favor for unpaid assessments.[3] Schueller contends the judgment was improper because Stone Hill's claims are barred by:

---

[3] Gillies states in her appellate brief that she "waives briefing on this issue and takes no position regarding the district court's grant of Stone Hill's claims for unpaid assessments." And Gillies did not file a notice of appeal to challenge the district court's ruling in favor of Stone Hill for unpaid assessments. So we refer only to Schueller in this section.

(i) "res judicata" and (ii) "the expiration of the covenants on which the claim[s are] based." We address each claim in turn.

*i. Res judicata*

We begin with Schueller's claim that, because Stone Hill lost a 2012 small claims case in which Stone Hill sought to recover assessments for 2011 and 2012, *res judicata* prevented Stone Hill from later recovering assessments from 2013 through 2019.

"The doctrine of res judicata includes both claim preclusion and issue preclusion." *Pavone v. Kirke*, 807 N.W.2d 828, 835 (Iowa 2011). "Claim preclusion is 'based on the principle that a party may not split or try his claim piecemeal . . . . A party must litigate all matters growing out of his claim at one time and not in separate actions.'" *Lemartec Eng'g & Constr. v. Advance Conveying Techs., LLC*, 940 N.W.2d 775, 779 (Iowa 2020) (citation omitted). "Issue preclusion prevents a party 'from relitigating in a subsequent action [any factual or legal] issues raised and resolved in [a] previous action.'" *Id.* (second alteration in original) (citation omitted).

We note, however, that under *Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 554 (Iowa 1981), a small claims adjudication cannot provide a basis for issue preclusion. *See, e.g.*, *Long Branch Maint. Corp. v. Adams*, No. 12-2020, 2014 WL 467516, at *4 (Iowa Ct. App. Feb. 5, 2014) (noting "Iowa case law does not preclude parties from relitigating a legal issue that has previously been ruled upon in a small claims action"); *Lawchek, Ltd. v. Qwest Commc'ns Fed. Servs., Inc.*, No. 10-0519, 2010 WL 4807558, at *4 (Iowa Ct. App. Nov. 24, 2010) (noting

"the Iowa Supreme Court has determined issue preclusion does not apply to small claims adjudications").

Even so, it appears a small claims adjudication *can* support a theory of claim preclusion. As we said in *Bagley*,

> Claim preclusion is different than issue preclusion, and, unlike issue preclusion, the adjudication of a claim in small claims court can have a preclusive effect within the regular jurisdiction of the district court. Claim preclusion can prevent a claimant from relitigating a claim in district court if the claim has been litigated in small claims court.

*Bagley v. Hughes A. Bagley, Inc.*, 465 N.W.2d 551, 554 (Iowa Ct. App. 1990) (citing *Donahue v. Am. Farmers Mut. Cas. Co.*, 380 N.W.2d 437, 439 (Iowa Ct. App. 1985)).

So we focus our attention on claim preclusion. In general, "claim preclusion holds that a valid and final judgment on a claim bars a second action on the adjudicated claim or any part thereof." *Pavone*, 807 N.W.2d at 835. "[I]t prevents piecemeal litigation by requiring a party to try the entire claim or defense in the case at trial." *Penn v. Iowa State Bd. of Regents*, 577 N.W.2d 393, 398 (Iowa 1998). To establish claim preclusion, a party must show:

> (1) the parties in the first and second action are the same parties or parties in privity, (2) there was a final judgment on the merits in the first action, and (3) the claim in the second suit could have been fully and fairly adjudicated in the prior case (i.e., both suits involve the same cause of action).

*Pavone*, 807 N.W.2d at 836. If any element is missing, the defense of claim preclusion fails. *See Arnevik v. Univ. of Minn. Bd. of Regents*, 642 N.W.2d 315, 319 (Iowa 2002).

Here, the first two elements appear to be undisputed. The parties in the first (small claims) action are the same parties disputing assessments now. *See*

*Pavone*, 807 N.W.2d at 836.  And "there was a final judgment on the merits in the" small claims action.  *Id.*

But the third element presents a different problem.  To fulfill this element, Schueller must show "the claim in the" current action "could have been fully and fairly adjudicated in the" small claims case.  *Id.*  He has not done so.  Bear in mind: The small claims case was litigated in *2012*.  It was about non-payment of assessments from 2011 and 2012.  The current claim is different.  The current claim is about assessments from *2013 through 2019*.  At the risk of stating the obvious, those assessments occurred *after* the 2012 small claims case.  So those assessments could not have been raised—much less "fully and fairly adjudicated"—in the 2012 small claims action.  *Id.*  And so claim preclusion does not bar recovery on those assessments.

*ii. Expiration*

We turn next to Schueller's contention that Stone Hill's claims for assessments are barred by "the expiration of the covenants on which the claim[s are] based."  By way of background: Stone Hill was founded in 1976, two years before Schueller and Gillies bought their townhouse.  Also in 1976, Stone Hill filed a set of restrictive covenants.  Article IV of the covenants permits Stone Hill to impose annual and special assessments on the owner(s) of each lot.  These 1976 assessment provisions form the basis of Stone Hill's current claims against Schueller for unpaid assessments.

But Schueller argues that Stone Hill's claims are barred by Iowa Code section 614.24 (2018), the "stale use statute."  *See Franklin v. Johnston*, No. 15-

2047, 2017 WL 1086205, at *3 (Iowa Ct. App. Mar. 22, 2017). Subsection 614.24(1) provides, in pertinent part:

> No action based upon any claim arising or existing by reason of the provisions of any deed or conveyance or contract or will reserving or providing for any reversion, reverted interests or *use restrictions* in and to the land therein described shall be maintained either at law or in equity in any court to recover real estate in this state or to recover or establish any interest therein or claim thereto, legal or equitable, against the holder of the record title to such real estate in possession after twenty-one years from the recording of such deed of conveyance or contract or after twenty-one years from the admission of said will to probate unless the claimant shall, personally, or by the claimant's attorney or agent, or if the claimant is a minor or under legal disability, by the claimant's guardian, trustee, or either parent or next friend, file a verified claim with the recorder of the county wherein said real estate is located within said twenty-one year period.

(Emphasis added.)

In Schueller's view, Stone Hill's assessment provisions are "use restrictions" for purposes of section 614.24(1). So, Schueller argues, subsection 614.24(1) required Stone Hill to either (a) bring any "action[s] based upon" unpaid assessments within "twenty-one years" after the covenants were recorded, or at least (b) "file a verified claim with the recorder of the county wherein said real estate is located within said twenty-one year period." *See* Iowa Code § 614.24(1). Because Stone Hill did neither, Schueller claims the 1976 assessment provisions are long "expired." And so, according to Schueller, Stone Hill is forever barred from recovering assessments from Schueller.

Stone Hill disagrees. In its view, the assessment provisions in the covenants were never "use restrictions" for purposes of subsection 614.24(1).[4] So, in Stone Hill's view, section 614.24 simply doesn't apply to the assessment provisions. It could not make them "expire" or otherwise prevent their enforcement.

To decide which view is correct, we apply traditional principles of statutory interpretation. We look for "a statute's meaning in the text of the statute, the words chosen by the legislature." *Fishel v. Redenbaugh*, 939 N.W.2d 660, 663 (Iowa Ct. App. 2019) (quotation marks omitted) (quoting *State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017)); *see also, e.g.*, *Fjords N., Inc. v. Hahn*, 710 N.W.2d 731, 739 (Iowa 2006) (carefully analyzing the words of section 614.24); *Amana Soc'y v. Colony Inn, Inc.*, 315 N.W.2d 101, 118 (Iowa 1982) (noting "[w]e take the statute as we find it" and observing that any "argument that the statute is inappropriate . . . should have been addressed to the legislature, not to this court"); *Chi. & Nw. Ry. Co. v. City of Osage*, 176 N.W.2d 788, 793 (Iowa 1970) (noting "we cannot by judicial interpretation nullify the definite pronouncements of the legislature"). "Generally, statutory words are presumed to be used in their ordinary and commonly understood sense." *City of Sioux City v. Iowa Dep't of Revenue & Fin.*, 666 N.W.2d 587, 590 (Iowa 2003); *see also Nix v. Hedden*, 149 U.S. 304, 307 (1893) (noting that, although "[b]otanically speaking, tomatoes are the fruit of a vine," they are "vegetables" in "the common language of the people"). Dictionaries can help us determine "the common and ordinary meaning of a word." *State v.*

---

[4] Stone Hill's argument relies entirely on the 1976 covenants. So we need not decide whether later covenants, which Schueller and Gilles did not sign, could be enforced against Schueller.

*Kidd*, 562 N.W.2d 764, 765 (Iowa 1997)*; see also Compiano v. Kuntz*, 226 N.W.2d 245, 249 (Iowa 1975) (consulting Webster's Third New International Dictionary (1969) to find the definition of "contract" for purposes of section 614.24).

As noted, the question here is whether the 1976 assessment provisions constitute "use restrictions" affecting Schueller's townhouse.[5]  *See* Iowa Code § 614.24(1).  We start our analysis with the word "use."  Dictionaries suggest "use" means "the act or practice of employing something."  *Use*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/use (last visited Dec. 18, 2020); *accord Use, Black's Law Dictionary* (11th ed. 2019) (defining "use" as the "employment of something").  So a "use restriction" on a townhouse would mean a "limitation on" how the townhouse can be "employ[ed]."  *Id.*; *see also Restriction*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/restriction (last visited Dec. 18, 2020) (defining "restriction" to mean, among other things, "a limitation on the use or enjoyment of property or a facility").  For example, in *Amana Society*, a restriction on certain business activities—including the sale of "sausage and cheese"—was a "use restriction" under section 614.24.  315 N.W.2d at 108–10.

But Schueller has not explained, and we do not understand, how the assessment provisions could constitute "use restrictions."  The assessments are merely obligations to pay money.  Apart from their economic impact, they impose

---

[5] Stone Hill's brief advises that "[t]o the undersigned's knowledge, there are no prior supreme court decisions that squarely address what is—and is not—a 'use restriction' within the meaning of [section] 614.24(1)."  Schueller does not point to a counterexample.

no limits on how Schueller might employ the townhouse. So we do not believe they are "use restrictions" for purposes of section 614.24.

As Schueller emphasizes, though, our courts have avoided interpretations of section 614.24 that appear contrary to its purposes. *See, e.g.*, *Fjords N., Inc.*, 710 N.W.2d at 739 (rejecting interpretation that "fails to consider the purpose of the statute"). But Schueller has not explained how our interpretation could run afoul of any such purpose. And we see no better way to advance the legislature's purposes than to give effect to the legislature's words, including the words "use restriction" in section 614.24. *See State v. Palmer*, 554 N.W.2d 859, 865 (Iowa 1996) ("We will not undermine the legislature's policy decision[s] by ignoring the plain language of the statute.").

Finally, both Schueller and Stone Hill draw our attention to the 2014 amendments to section 614.24. 2014 Iowa Acts ch. 1067, § 1 (codified at Iowa Code § 614.24(5) (2018)). Through those amendments, our "legislature enacted for the first time a definition of 'use restrictions.'" *Franklin*, 2017 WL 1086205, at *5. The definition appears in subsection (5), which states as follows:

> As used in this section, "use restrictions" means a limitation or prohibition on the rights of a landowner to make use of the landowner's real estate, including but not limited to limitations or prohibitions on commercial uses, rental use, parking and storage of recreational vehicles and their attachments, ownership of pets, outdoor domestic uses, construction and use of accessory structures, building dimensions and colors, building construction materials, and landscaping. As used in this section, "use restrictions" does not include any of the following:
>
> a. An easement granting a person an affirmative right to use land in the possession of another person including but not limited to an easement for pedestrian or vehicular access, reasonable ingress and egress, solar access, utilities, supporting utilities, parking areas, bicycle paths, and water flow.

> *b. An agreement between two or more parcel owners providing for the sharing of costs and other obligations for real estate taxes, insurance premiums, and for maintenance, repair, improvements, services, or other costs related to two or more parcels of real estate regardless of whether the parties to the agreement are owners of individual lots or incorporated or unincorporated lots or have ownership interests in common areas in a horizontal property regime or residential housing development.*
>
> c. An agreement between two or more parcel owners for the joint use and maintenance of driveways, party walls, landscaping, fences, wells, roads, common areas, waterways, or bodies of water.

Iowa Code § 614.24(5) (emphasis added).

We emphasize paragraph 614.24(5)(b). It explicitly provides that assessment provisions—like those among Stone Hill's covenants—are not "use restrictions." *Id.* On this point, the parties agree.[6]

There is less agreement, though, as to the importance of this amendment to the present case. Stone Hill suggests it merely clarifies the statute. So, Stone Hill argues, we should give the amendment retroactive effect and then—based on its clarifying definition—conclude the 1976 assessment provisions are not "use restrictions."

Schueller disagrees. He emphasizes that—because the 1976 assessment provisions were (in his view) "use restrictions" under the pre-amendment language of section 614.24—they "expired" long before the 2014 amendment. And "it would be erroneous," Schueller warns, to "apply the amendment" in a way that would "restore," "resurrect," "recreate," or "reincarnate" those long-expired assessment

---

[6] On page thirteen of his reply brief, Schueller states he "acknowledges that an agreement to share costs for maintenance, repairs, improvements and services is now expressly excluded from the definition of 'use restriction' pursuant to the 2014 amendment to section 614.24."

provisions.  *See Franklin*, 2017 WL 1086205, at *14 (Danilson, C.J., concurring specially).

But Stone Hill's assessment provisions don't need to be revived unless they actually "expired."  And they could not have "expired" unless they were "use restrictions" under the pre-amendment language of section 614.24.  We conclude they were not.  So we need not decide whether the amendment could have reinvigorated them.[7]

We affirm the district court's award of unpaid assessments from 2013 through 2019 to Stone Hill.

**IV. Conclusion**

For the reasons explained above, we affirm the district court's order.

**AFFIRMED.**

---

[7] We note Schueller's argument that Stone Hill "was operating under the belief that the 1976 covenants, in their entirety, had expired."  But Schueller does not explain what legal theory would connect Stone Hill's subjective beliefs with a favorable outcome for Schueller.  Nor does Schueller cite authority that could support reversal on these grounds.  So we decline to reverse on this basis.  *See* Iowa R. App. P. 6.903(2)(g)(3); *see also State v. Gibbs*, 941 N.W.2d 888, 902 (Iowa 2020) (McDonald, J., concurring specially) (discussing waiver through failure to develop an argument or cite authority).