# IN THE SUPREME COURT OF IOWA

No. 07–1808

Filed July 2, 2010

C & J VANTAGE LEASING CO.,
ASSIGNOR TO FRONTIER LEASING
CORP., ASSIGNEE,

Appellee,

vs.

OUTLOOK FARM GOLF CLUB, LLC
d/b/a THE LINKS AT OUTLOOK
GOLF COURSE,

Appellant.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

Defendant appeals district court grant of summary judgment enforcing an agreement. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Paul S. Swinton of Parker, Simons & McNeill, P.L.C., West Des Moines, for appellant.

Edward N. McConnell and Aaron H. Ginkens of Ginkens & McConnell, P.L.C., Clive, for appellee.

**STREIT, Justice**.

Royal Links USA (Royal Links), an advertising company, structured a deal that was too good to be true. It promised defendant Outlook Farm Golf Club, LLC, d/b/a The Links at Outlook Golf Course (Outlook) that the course could obtain a beverage cart for "net-zero" by leasing the cart for the same amount that Royal Links would pay to the course for the opportunity to place advertising on the cart. Leasing company C and J Leasing Corp. (C & J)[1] purchased the carts from Royal Links for $12,500 each and Outlook agreed to pay C & J a total of $18,840, in monthly payments, for each cart. Royal Links agreed to make monthly payments to Outlook for advertising. After entering into the transaction, Royal Links eventually stopped making advertising payments. The beverage carts are apparently largely worthless and Outlook would like out of its agreement with C & J. Because Outlook has raised a genuine issue of material fact regarding its affirmative defense of fraud in the inducement and counterclaim of fraudulent misrepresentation, the district court's grant of summary judgment to C & J is reversed and the case remanded.

## I. Prior Facts and Proceedings.

Outlook, a company located in Maine, received an unsolicited fax from Royal Links, an Ohio corporation, which advertised the "beverage caddy express" available on a "net-zero basis." Jeff Maldonis, a representative of Outlook, entered into an "Equipment Lease Agreement" which obligated Outlook to pay $628 in monthly payments to C & J, an Iowa corporation, to lease two beverage carts ($314 per beverage cart). Outlook also entered into an agreement with Royal Links that required

---

[1]C and J Leasing Corp. assigned its interest to C & J Vantage Leasing Co., which assigned its rights to Frontier Leasing Corp. Unless otherwise noted, we will refer to these parties collectively as "C & J."

Royal Links to pay $628 ($314 per beverage cart) to Outlook in exchange for Outlook placing Royal Links' advertising on the beverage carts. Therefore, the result was intended as a "net-zero" for Outlook because it was obligated to pay the same amount monthly to C & J that it would receive monthly from Royal Links.

As part of this transaction, C & J purchased the two beverage caddy carts from Royal Links for $12,500 per cart. C & J then leased the carts to Outlook for 60 monthly payments of $314 per cart, or $18,840 total per cart. Both parties agree that the carts are worth substantially less than $12,500 and $18,840. Outlook estimates the carts are worth $1,500 at best. C & J was able to sell a similar cart on eBay for $642.58.[2]

The agreement between C & J and Outlook contained a hell-or-high-water clause which stated the obligations "are absolute and unconditional and are not subject to cancellation, reduction or setoff for any reason whatsoever." A "hell-or-high-water clause" is a clause "requiring the lessee to continue to make full rent payments to the lessor even if the thing leased is unsuitable, defective, or destroyed." *Black's Law Dictionary* 742 (8th ed. 2004). Additionally, the agreement disclaimed any causes of action based on express or implied warranties against C & J.

Approximately six months later, Royal Links stopped making advertising payments to Outlook, and Outlook in turn stopped making the monthly payments to C & J. C & J brought this breach of contract action against Outlook. Outlook filed an answer asserting the affirmative

---

[2]One district court judge has referred to the carts as "an ice chest on wheels." *See C and J Leasing Corp. v. Hendren Golf Mgmt., Inc.*, No. 06–0429, 2007 WL 257955, at *1 n.3 (Iowa Ct. App. Jan. 31, 2007). The carts have no mechanized features of any kind for transportation, refrigeration, or a cash register.

defense of fraud in the inducement and a counterclaim of fraudulent misrepresentation, alleging that Royal Links was acting as an agent for C & J. C & J moved for summary judgment.

The district court stayed this case pending resolution of *C & J Leasing Corp. v. Hendren Golf Management., Inc.*, No. 06–0249, 2007 WL 257955 (Iowa Ct. App. Jan. 31, 2007). This case and *Hendren* represent two of 409 similar arrangements between golf courses, Royal Links, and C & J. In *Hendren,* the Iowa Court of Appeals upheld the district court's decision after trial that there was no agency relationship between C & J and Royal Links, reversed the district court's decision that the agreement was unconscionable, and held that the agreement was a finance lease with a valid hell-or-high-water clause. *Id.* at *2–4. The appellate court enforced the agreement. Hendren did not seek further review with this court.

After the appellate court entered its decision in *Hendren*, the district court entered summary judgment for C & J. Outlook appealed, arguing that summary judgment was inappropriate because: (1) the transaction should be considered a secured transaction instead of a finance lease; (2) there is a genuine issue of material fact regarding whether an agency relationship existed between C & J and Royal Links, which would allow Outlook's defense of fraud in the inducement to proceed; and (3) the close-connection doctrine prevents C & J from enforcing the lease.

## II. Scope of Review.

This court reviews a summary judgment to determine whether the moving party demonstrated the absence of any genuine issues of material fact and established entitlement to judgment on the merits as a matter of law. *Rants v. Vilsack,* 684 N.W.2d 193, 199 (Iowa 2004). " 'We

examine the record in a light most favorable to the party opposing the motion for summary judgment to determine if movant met his or her burden.' " *Id.* (quoting *Junkins v. Branstad*, 421 N.W.2d 130, 132–33 (Iowa 1988)). An issue is "material" if it might affect the outcome of the suit, and is "genuine" if " 'a reasonable jury could return a verdict for the nonmoving party.' " *Id.* We review the application of the law to the undisputed facts for correction of errors at law. *Iowa Grocery Indus. Ass'n v. City of Des Moines*, 712 N.W.2d 675, 678 (Iowa 2006).

**III.  Merits.**

**A.  Finance Lease or Sale with a Security Interest.** Outlook argues the transaction is properly considered an agreement creating a security interest. C & J contends the transaction is properly considered a finance lease.[3]

> A "finance lease" involves three parties – the lessee/business, the finance lessor, and the equipment supplier. The lessee/business selects the equipment and negotiates particularized modifications with the equipment supplier. Instead of purchasing the equipment from the supplier, the lessee/business has a finance lessor purchase the selected equipment, and then leases the equipment from the finance lessor.

---

[3]The Iowa Court of Appeals recently held, in another transaction involving C & J and a different golf course, that "[n]othing in the Code . . . prevents a security interest from being added to a finance lease agreement." *Hendren*, 2007 WL 257955 at *4. Given the substantial body of law dedicated to determining whether an agreement is a lease or a transaction with a security interest under the Uniform Commercial Code (UCC), and the different UCC sections creating default provisions based on the distinction, it is incorrect to suggest an agreement can be both. *Hendren* is therefore overruled in this respect. *See* 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 13–2, at 4 (5th ed. 2009) (noting that "distinguishing between leases and secured sales agreements" is one of the "most frequently litigated [issues] under the entire Uniform Commercial Code"); *In re Ecco Drilling Co.*, 390 B.R. 221, 226 n.30 (Bankr. E.D. Tex. 2008) ("[E]ven Article 2A governing finance leases defers to the analysis [for a security interest] . . . . If the transaction meets the definition of security interest . . . then it does not qualify as a lease.").

*Colonial Pac. Leasing Corp. v. McNatt*, 486 S.E.2d 804, 807 (Ga. 1997). A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Iowa Code § 554.1201(37)(*a*) (2003).

Iowa has adopted the Uniform Commercial Code (UCC), codified as Iowa Code chapter 554. Article 2A of the UCC was codified as Iowa Code chapter 554, article 13, and enacted to directly address leases. Article 9 of the UCC was codified as Iowa Code chapter 554, article 9, and addresses secured transactions. Article 1 of the UCC was codified as Iowa Code chapter 554, article 1, and establishes general provisions. To be considered a finance lease under Iowa's article 13 (Article 2A of the UCC), the transaction must first qualify as a lease. Iowa Code § 554.13103(1)(*g*) (" *'Finance lease'* means a lease . . ."). The definition of "lease" further explains that "a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease." Iowa Code § 544.13103(1)(*j*).

"Whether a transaction creates a lease or a security interest is determined by the facts of each case." Iowa Code § 554.1201(37)(*b*). Because the definition of a lease excludes agreements that create a security interest, a court must first turn to the definition of security interest. Iowa Code section 554.1201(37)(*b*) creates a two-part test to identify a security interest.[4] An agreement is a security interest if (1) it is

---

[4]Iowa Code section 554.1201(37)(*b*), now codified as Iowa Code section 554.1203, states that a transaction creates a security interest if:

> the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
> > (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
> >
> > (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

not subject to termination by the lessee, and (2) it meets one of the criteria listed in section 544.1201(37)(*b*), subsections 1 through 4. Courts interpreting the statute "have found it to mandate a finding of a security interest if the two-part test is satisfied." E. Carolyn Hochstadter Dicker & John P. Campo, *FF&E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1–201(37)*, 7 Am. Bankr. Inst. L. Rev. 517, 546, 546 n.101 (1999) (citing cases). Therefore, courts frequently refer to this definition as a bright-line or per se rule: If the two-part test is satisfied, the agreement is a security interest and cannot be a lease or a finance lease. *See In re Pillowtex, Inc.,* 349 F.3d 711, 717 (3d Cir. 2003) ("After indicating that courts are to examine the facts of each case in order to characterize a transaction, the statute sets out a bright-line test, sometimes referred to as a per se rule, for determining whether a transaction creates a security interest as a matter of law.").

An agreement which does not meet the two-part test may still be considered a transaction which creates a security interest based on the specific facts of the agreement. *See In re Taylor*, 209 B.R. 482, 484–85 (Bankr. S.D. Ill. 1997) ("If the Court determines that the transaction is not a disguised security agreement *per se*, it must then look at the specific facts of the case to determine whether the 'economics of the transaction' suggest such a result.").

This court does not have occasion to reach the issue of whether the agreement between Outlook and C & J was a finance lease or a sale with

---

(3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

(4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

a security interest for two reasons. First, Outlook did not preserve this issue. It was not argued to the district court that the agreement creates a security interest and is therefore not a lease. Outlook's answer to C & J's petition does not assert the agreement is a sale with a security interest and instead "admits that a lease was entered into by Outlook Golf Club." Additionally, the summary judgment briefing did not argue the lease was actually a sale with a security interest, and such argument was not made orally during the summary judgment hearing. *See State v. McCright*, 569 N.W.2d 605, 607 (Iowa 1997) ("Issues not raised before the district court . . . cannot be raised for the first time on appeal.").

Second, Outlook has put forth no reason why the distinction would require that summary judgment be vacated in this case. Although the statutory default provisions governing finance leases provide for a default hell-or-high-water clause, here, the provision that states Outlook's contractual obligations are "absolute and unconditional" is contained in the contract and C & J does not seek to rely on the statutory default provision for finance leases found in article 13. One could argue that under article 9, which addresses secured transactions, a court may only enforce a waiver of defenses if the party who seeks to enforce the agreement—here, the assignor Frontier Leasing Corp.—is a holder in due course. *See Lyon Fin. Servs., Inc. v. Woodlake Imaging, LLC*, No. Civ. A. 04–CV–3334, 2005 WL 331695, at *4–5 (E.D. Pa. Feb. 9, 2005). We need not reach this argument, however, because Outlook has not raised it and has not put forth any defenses that it would be able to assert but for the clause making the agreement "absolute and unconditional." Instead, Outlook asserts through the affirmative defense of fraud in the inducement and a counterclaim of fraudulent misrepresentation that fraudulent misrepresentations caused it to enter the agreement. This

was the only argument made by Outlook both in resistance to summary judgment before the district court and reasserted on appeal. Because this is a defense to contract formation, it may be raised despite the hell-or-high-water clause or a waiver-of-defenses clause. *See Colo. Interstate Corp. v. CIT Group/Equip. Fin., Inc.*, 993 F.2d 743, 749 (10th Cir. 1993) (holding hell-or-high-water clause enforceable "[i]n the absence of fraud or deceit"); Uniform Commercial Code § 2A–407, cmt. 5 (explaining that absent application of "the law with respect to fraud, duress, or the like," the lessee has no claim against the lessor under a hell-or-high-water clause); Uniform Commercial Code § 9–403 (assignee with holder-in-due-course status may enforce waiver-of-defenses provision except for defenses that may be asserted under section 3–305(b), which include "fraud that induced the obligor to sign the instrument with neither knowledge or reasonable opportunity to learn of its character or its essential terms"). To assert that fraudulent misrepresentations induced it to enter into the contract, Outlook must raise a genuine issue of material fact regarding agency between Royal Links and C & J, which we address below. Outlook does not suggest, however, that this defense or claim would be affected based on the agreement's status as a finance lease or a sale creating a security interest.

Outlook argues in its appellate brief that the designation of the agreement as a sale with a security interest prevents summary judgment because Iowa Code section 554.2615(*a*) provides that performance will be excused "if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." This defense cannot apply to Outlook. The full sentence of section 554.2615(*a*) states that

> [d]elay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of the seller's duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . .

(Emphasis added.) Section 554.2615(*a*) provides a defense for *a seller.* If the agreement was a sale with a security interest, Outlook was the *purchaser* of the beverage cart.[5]

Because Outlook has neither preserved the issue, nor presented this court with a valid argument for why it would require reversal of summary judgment were the court to agree with Outlook, we decline to consider the question of whether the agreement is a finance lease or a sale creating a security interest. *See Pierce v. Staley*, 587 N.W.2d 484, 486 (Iowa 1998) ("When a party, in an appellate brief, fails to state, argue, or cite authority in support of an issue, the issue may be deemed waived.").

**B. Agency.** Outlook argues there are genuine issues of material fact regarding whether Royal Links was acting as an agent for C & J, which would allow Outlook to pursue its defense of fraud in the inducement and its counterclaim of fraudulent misrepresentation against C & J. Outlook complains that the transaction was misrepresented by employees of Royal Links and Outlook was therefore induced to enter into the agreement. Because all alleged misrepresentations were made by Royal Links employees, Outlook argues that Royal Links was operating as an agent for C & J. As noted above, defenses to contract formation, such as fraud in the inducement, may be asserted even where

---

[5]We also note but do not address that this provision is found in Iowa Code chapter 554, article 2, which addresses sales, and not in article 9, which addresses secured transactions.

a party has agreed to a hell-or-high-water clause or a waiver-of-defenses provision.

An agency relationship may be actual (express or implied) or apparent. *See Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010). Outlook does not appear to argue that Royal Links had actual authority to act on C & J's behalf, but instead argues that C & J allowed Outlook to believe Royal Links was its agent and thereby created apparent authority. "For apparent authority to exist, the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority." *Vischering v. Kading*, 368 N.W.2d 702, 711 (Iowa 1985); *see also Frontier Leasing*, 781 N.W.2d at 776 ("Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing.").

Outlook makes several points to support the alleged agency relationship. First, Outlook notes that C & J allowed Royal Links to place Royal Links' own logo at the top of the lease. Second, Outlook notes that the monthly charge under the Lease Agreement with C & J—$314 per month per beverage cart or $628—was identical to the monthly payment to be received by Outlook from Royal Links for advertising. Third, neither the interest rate, nor the amount at which C & J purchased each beverage cart from Royal Links, are included on the lease agreement. Instead, the lease agreement only references the monthly payment, which is identical to the payment in the Royal Links agreement.

In support of its argument that there was no agency relationship, C & J relies on an affidavit by its CEO and president attesting that C & J was not affiliated in any way with Royal Links and was not aware that Royal Links separately agreed to pay Outlook an amount equal to the

lease payments.  C & J also points to the agreement itself, which states "[t]he dealer and its representatives are not our agents and are not authorized to modify the terms of this lease."  Further, Outlook signed a "Delivery and Acceptance Certificate," which acknowledged that "Supplier is not an employee or agent of C and J Leasing and Supplier is not authorized to amend the terms of the Equipment Lease."  Outlook also wrote a check payable to C & J and dated the same day as the agreement.

Although the contracts state that Royal Links is not an agent of C & J, "such a contractual statement is 'not necessarily conclusive as to the non-existence of such a relationship.' "  *Colonial Pac. Leasing Corp.*, 486 S.E.2d at 808 (quoting *Potomac Leasing Co. v. Thrasher*, 354 S.E.2d 210, 212 (Ga. Ct. App. 1987)).  Drawing all inferences in favor of Outlook, the nonmoving party, there is circumstantial evidence that Royal Links created the paperwork used in the transaction.  C & J claims the lease terms were negotiated between C & J and Outlook, but provides no explanation for the identical monthly payments and lack of any reference to the price of the beverage carts and interest rate.  Although the affidavit of C & J's CEO and president states that "[t]he lease terms were negotiated between C & J and the customer/lessee," there is no evidence that C & J and Outlook had any contact until after Outlook signed the agreement.  These discrepancies suggest that C & J may have allowed Royal Links to arrange the terms of the lease agreement and create and prepare the paperwork manifesting the lease agreement. *Compare Potomac Leasing Co.*, 354 S.E.2d at 211–13 (holding evidence that supplier's employees were trained to complete the finance lease documents and were authorized by the finance lessor to negotiate a finance lease was sufficient to defeat a motion for directed verdict), *with Gulf Winds, Ltd. v. First Union Bank*, 370 S.E.2d 508, 509–10 (Ga. Ct.

App. 1988) (upholding factfinder determination that supplier's employee who merely submitted lessee's credit application to the finance lessor, but was not authorized to negotiate the terms of or prepare the lease agreement, was not an agent of the finance lessor).

The existence of agency is ordinarily an issue of fact. *Walnut Hills Farms, Inc. v. Farmers Co-op Co. of Creston*, 244 N.W.2d 778, 781 (Iowa 1976). Although the express statements disavowing an agency relationship in the contracts, along with the check written to C & J, may cause a factfinder to ultimately conclude that C & J did not "act[] in such a manner" that would lead Outlook to believe Royal Links was its agent, *Vischering*, 368 N.W.2d at 711, Outlook has raised a genuine issue of material fact that allows the question to go to a factfinder.

**C. Close-Connection Doctrine.** Outlook argues this court should adopt the "close-connection" doctrine. The close-connection doctrine developed in the context of negotiable instrument transactions to prevent holder-in-due-course status where the transferor was closely affiliated with the transferee. "[A] transferee does not take an instrument in good faith when the transferee is so closely connected with the transferor that the transferee may be charged with knowledge of an infirmity in the underlying transaction." *Arcanum Nat'l Bank v. Hessler*, 433 N.E.2d 204, 209 (Ohio 1982).

Outlook argues for the first time on appeal that the close-connection doctrine should be extended to the finance leasing context in an attempt to prevent the parties from using finance lessor status to perpetrate fraud. In the context of finance leases, application of the close-connection doctrine would sever finance lessor status for a lessor who is closely connected with the equipment vendor. Therefore, the lessor would lose the ability to enforce a valid hell-or-high-water clause and would possibly be subject to the implied warranties of the vendor.

*See* Matthew A. Smith, *Brothers at Arm's Length: U.C.C. Article 2A, Captive Finance Companies, and the Close-Connection Doctrine*, 1999 Wis. L. Rev. 1051, 1069 (1999).

Outlook framed its argument resisting summary judgment in terms of agency and the district court entered a ruling on the issue of agency and not on the issue of the close-connection doctrine. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Outlook did not file a motion requesting a ruling on the close-connection doctrine. *See id.* ("When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal."). We decline to address whether the close-connection doctrine should be adopted and whether it would have any application to this case because Outlook has failed to preserve the issue.

**IV. Conclusion.**

Outlook failed to preserve or present an argument for why a decision that the agreement in question is a sale with a security interest instead of a finance lease would require this court to overturn the grant of summary judgment. Additionally, Outlook failed to preserve its argument that the court should adopt the close-connection doctrine. Outlook has, however, raised an issue of material fact regarding whether an agency relationship existed between C & J and Royal Links which would allow Outlook to assert its defense of fraud in the inducement and counterclaim of fraudulent misrepresentation.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**