# IN THE SUPREME COURT OF IOWA

No. 09–0222

Filed December 9, 2011

JOHN P. PAVONE and SIGNATURE
MANAGEMENT GROUP, L.L.C.,

    Appellants,

vs.

GERALD M. KIRKE and WILD ROSE
CLINTON, L.L.C.,

    Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

A party to a contract appeals an adverse ruling on a motion for summary judgment. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Timothy S. Bottaro and Amanda Van Wyhe of Vriezelaar, Tigges, Edgington, Bottaro, Boden & Ross, L.L.P., Sioux City, for appellants.

Mark McCormick, David M. Swinton, and Margaret C. Callahan of Belin McCormick, P.C., Des Moines, and Brent B. Green and Mariclare Thinnes Culver of Duncan, Green, Brown & Langeness, Des Moines, for appellees.

**WIGGINS, Justice.**

In this appeal, the parties to a contract contend the district court erred when it granted the opposing parties' motion for summary judgment by finding the opposing parties repudiated the contract and claim preclusion barred the bringing of this action. We transferred the case to the court of appeals. The court of appeals affirmed the district court's ruling. We then granted further review. On further review, we find the district court was correct in dismissing the action. Therefore, we affirm the decision of the court of appeals and the judgment of the district court.

## I. Background Facts and Proceedings.

On October 22, 2004, John Pavone and Signature Management Group, L.L.C. (hereinafter collectively referred to as SMG) and Gerald M. Kirke and Wild Rose Entertainment, L.L.C. (hereinafter collectively referred to as Wild Rose) executed a document entitled "Agreement," which, in part, attempted to delineate the parties' relationship with regard to future casino projects in Iowa. Paragraph five of the agreement deals with future management opportunities and provides:

> 5. **Future Casino Development Opportunities.**
>
> A. First Look and Good Faith Negotiation as to Future Casino Development and Management Opportunities.
>
> i. If Wild Rose has the opportunity to develop or operate *any other casino in Iowa,* Wild Rose will use good faith best efforts to involve SMG when the opportunity is first known, *and to negotiate in good faith a Management Agreement* consistent with the terms outlined in Wild Rose's gaming development agreement with the City of Ottumwa, Iowa. It being understood that the award of any management agreement must also be satisfactory to third party community and non-profit organizations. And it being further understood that any casino in the Central Iowa area will likely require the involvement of a management company, other than SMG.

(Emphasis added.)

On May 11, 2005, the Iowa Racing and Gaming Commission (IRGC) awarded Wild Rose a gaming license to develop a casino in Emmetsburg. On May 24 Wild Rose sent a letter to SMG (hereinafter referred to as the "termination letter") allegedly terminating the October agreement and any future relationship between the parties. This letter stated:

> This letter is to formally notify you that the Agreement dated October 22, 2004 (the "Agreement") between Signature Management Group, L.L.C. ("Signature") and Wild Rose Entertainment, L.L.C., terminated pursuant to its terms effective May 11, 2005. Upon receipt of a final invoice from Signature, Wild Rose will pay the agreed consulting fees and expenses through May 11, 2005.
>
> Since the Iowa Racing and Gaming Commission did not award a license to Wild Rose for the Ottumwa project, and the referendums were defeated in Warren, Madison and Dallas counties last November, the contingencies set forth in the Agreement unfortunately were not satisfied.
>
> We thank you for the consulting services Signature provided to Wild Rose and sincerely regret we were unable to realize our respective expectations under the Agreement.

The attorney for Wild Rose, Jim Krambeck, also e-mailed a copy of the termination letter to SMG's attorney, Ryan Ross, that same day. Ross responded via e-mail asking Krambeck, "Does this mean Wild Rose has ended negotiations as to the Management Agreement/Buy-out, or are you still waiting to talk with your client later this week? Please let me know so that I can advise Signature accordingly." Krambeck responded:

> Ryan, As reported in my e-mail message earlier today I will meet with my clients as soon as they are available to discuss their thoughts concerning the future relationship, if any, with John Pavone. Following that meeting I will be in contact with you.
>
> In response to your 12:10 p.m. e-mail, I strongly disagree with your characterization of the facts, the issues & the

position of Wild Rose in this matter. A point by point rebuttal is not appropriate at this time, however, to claim that Wild Rose "walked out of the negotiations" is simply not true. The fact is that we thought we were close to an agreement on the Ottumwa project when your client refused to agree after you told me you thought we had a deal & then sought to revisit issues that had been previously resolved. Unfortunately, the parties simply were unable to reach agreement. I am still willing to work on finding common ground but if this dispute is to be resolved, your adversarial & inflammatory e-mail messages will need to be curtailed.

The next day, Ross e-mailed Krambeck stating,

Jim: Thank you for clarifying that negotiations continue. I will wait to hear back from you after you speak with your clients. Signature remains prepared to continue negotiating the terms of the Management Agreement as required by the October 22, 2004 agreement.

There is no evidence Wild Rose responded to this last e-mail or that any further negotiations occurred. On July 12, 2005, SMG sent a proposed management agreement for the Emmetsburg casino to Wild Rose, requesting that Wild Rose execute the agreement and return it to SMG. There is no evidence Wild Rose responded, and the parties never executed a management agreement for the Emmetsburg casino.

On March 31, 2006, SMG filed a civil action against Wild Rose (hereinafter referred to as the "Emmetsburg action") alleging, in part, Wild Rose breached the management agreement contained in paragraph 3A of the October agreement for the Emmetsburg casino and failed to negotiate in good faith a management agreement for the Emmetsburg casino in violation of paragraph 5A. On August 20, 2007, a jury trial commenced, which resulted in a jury verdict finding Wild Rose breached paragraphs 3A and 5A of the October agreement. The jury awarded SMG $10 million in damages. In *Pavone v. Kirke*, 801 N.W.2d 477 (Iowa 2011) (*Pavone I*), we affirmed the verdict.

During the course of the Emmetsburg action, on June 8, 2006, the IRGC awarded Wild Rose a gaming license to develop a casino in Clinton. Wild Rose did not contact or negotiate a management agreement with SMG regarding management of the Clinton casino. On August 15, 2008, SMG filed a separate action against Wild Rose Clinton, L.L.C., a wholly owned subsidiary of Wild Rose Entertainment, L.L.C. (hereinafter referred to as the "Clinton action").[1] SMG alleged Wild Rose breached paragraph 5A of the October agreement by failing to negotiate in good faith with SMG for the management of the Clinton casino. Paragraph 5A of the October agreement was litigated in the Emmetsburg action. Wild Rose denied the allegations in the petition and asserted a number of affirmative defenses.

Wild Rose filed a motion for summary judgment, arguing the doctrine of claim preclusion barred SMG's current claim as a matter of law. The district court granted Wild Rose's motion for summary judgment, concluding the doctrine of claim preclusion barred SMG's current claim because both actions involved the same agreement and provision, the parties were the same in both actions, and there was ample time for SMG to seek damages relating to the Clinton casino in the Emmetsburg action. Thus, the district court held, "Plaintiffs have split their claim for breach of the agreement; therefore, this case is barred by the doctrine of claim preclusion."

SMG filed a notice of appeal. We transferred the case to the court of appeals. The court of appeals affirmed the district court's entry of summary judgment in favor of Wild Rose. The court of appeals

---

[1]At the district court, the parties agreed the fact that Wild Rose Clinton, L.L.C. is technically a different entity from Wild Rose Entertainment, L.L.C. was not relevant to the issues pertaining to Wild Rose's summary judgment motion.

concluded the termination letter was a definite and unequivocal repudiation of the entire October agreement, which Wild Rose never nullified or retracted. Thus, "the repudiation constituted a total breach and required SMG to seek damages for all remaining rights of performance under the contract in the first lawsuit." Accordingly, the court of appeals held that because SMG had already brought the Emmetsburg action, it was precluded from seeking damages for any remaining rights of performance under the October agreement. Subsequently, SMG filed an application for further review, which we granted.

## II. Scope of Review.

"We review a district court decision granting or denying a motion for summary judgment for correction of errors at law." *Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs.*, 754 N.W.2d 854, 857 (Iowa 2008) (citing Iowa R. App. P. 6.4, now rule 6.907). If there is no genuine issue of material fact after a review of the entire record, summary judgment is appropriate. *Stew-Mc Dev., Inc. v. Fischer*, 770 N.W.2d 839, 844 (Iowa 2009). Accordingly, "[t]his court reviews a summary judgment to determine whether the moving party demonstrated the absence of any genuine issues of material fact and established entitlement to judgment on the merits as a matter of law." *C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC*, 784 N.W.2d 753, 756 (Iowa 2010). In performing this review, we examine the record in a light most favorable to the nonmoving party to determine if the moving party has met its burden. *Id.*; *accord Wallace*, 754 N.W.2d at 857 (stating the nonmoving party is afforded the benefit of every legitimate inference that can be reasonably deduced from the record).

### III. Discussion and Analysis.

**A. Repudiation.** SMG claims a genuine issue of material fact exists as to whether Wild Rose repudiated the October agreement. It further claims if there is no genuine issue of fact as to repudiation, a genuine issue of fact exists as to whether Wild Rose retracted its repudiation.

1. *Repudiations generally.* The Restatement (Second) of Contracts defines a contractual repudiation as:

> (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or

> (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

Restatement (Second) of Contracts § 250, at 272 (1981). The Restatement further explains that "[i]n order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Id.* § 250 cmt. *b*, at 273.

Iowa law is consistent with section 250 of the Restatement. *See, e.g., Conrad Bros. v. John Deere Ins. Co.*, 640 N.W.2d 231, 241 (Iowa 2001) (recognizing, to constitute a repudiation, "[t]he statement must be sufficiently positive to be reasonably understood . . . that the breach will actually occur" (internal quotation marks omitted)); *Lane v. Crescent Beach Lodge & Resort, Inc.*, 199 N.W.2d 78, 82 (Iowa 1972) ("Anticipatory breach requires a definite and unequivocal repudiation of the contract."). A repudiation is accomplished by words or acts before the time of performance evidencing an intention to refuse to perform in the future.

*Lane,* 199 N.W.2d at 82. Moreover, we have recognized a party does not prove a repudiation by simply showing a party's negative attitude, a party's attitude indicating more negotiations are sought, or that a party may finally perform. *Id.*

2. *Repudiation analysis.* SMG argues the termination letter does not amount to a total repudiation of the October agreement because it is ambiguous. In response, Wild Rose argues the termination letter unambiguously communicated Wild Rose's intent not to perform further under the October agreement and, therefore, constituted a total repudiation of the October agreement.

The termination letter definitely and unequivocally declared Wild Rose's belief that the October agreement "terminated pursuant to its terms effective May 11, 2005." Wild Rose then thanked SMG for its consulting services and expressed its regret that the parties' expectations under the October agreement were not realized.

SMG argues the letter is ambiguous because it is unclear whether the termination letter only applies to the counties specifically mentioned in the letter (i.e., Warren, Madison, and Dallas, but not Clinton) or all projects the parties were working on at the time (i.e., including Clinton). However, the termination letter explicitly evinces Wild Rose's intent to terminate the entirety of the October agreement. Moreover, Wild Rose's expression of regret that the parties' expectations under the October agreement were not realized clearly indicates a total repudiation of any obligations it had under the agreement, including any expectations the parties had about any future projects, including Clinton.

SMG also contends the October agreement required 120 days written notice to terminate "pursuant to its terms." Therefore, because the termination letter attempted to terminate the October agreement

retroactively, its intended effect is ambiguous. Simply because Wild Rose failed to abide by the termination provisions of the October agreement does not mean the termination letter was not an unequivocal repudiation. Wild Rose correctly notes that "[t]he letter by definition would not have been a 'repudiation' if Wild Rose had invoked the voluntary termination provision and purported to give 120 days notice." The fact that Wild Rose did not give 120 days written notice before terminating the October agreement reinforces that Wild Rose was in breach of the October agreement due to its unequivocal repudiation.

Additionally, SMG argues the termination letter was not an unambiguous repudiation because SMG did not elect to treat it as such. After the termination letter, SMG's attorney appeared to believe negotiations for the Emmetsburg management agreement were to continue pursuant to the October agreement. Moreover, a few months later, SMG sent Wild Rose a proposed management agreement for the Emmetsburg casino to be executed between the parties. However, the record does not contain any evidence that Wild Rose responded to the proposed management agreement or participated in any further negotiations. "The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation." Restatement (Second) of Contracts § 257, at 296. Therefore, SMG's mistaken belief about the effect of the termination letter and its urging of Wild Rose to execute a management agreement pursuant to the October agreement cannot change the effect of Wild Rose's unequivocal repudiation of its obligations under the October agreement.

Finally, SMG knew Wild Rose repudiated the October agreement because it filed suit in the Emmetsburg action to enforce the agreement.

There would have been no reason for SMG to file the Emmetsburg action if Wild Rose had not repudiated the October agreement.

Accordingly, we hold the termination letter was sufficiently positive to be reasonably interpreted to mean that Wild Rose intended not to perform any more obligations it may have had under the October agreement. Therefore, as a matter of law, the termination letter constituted a total repudiation of the October agreement. Consequently, there is no genuine issue of material fact that the language of the termination letter met this requirement.

3. *Retraction of the repudiation.* SMG argues, even if there was an unambiguous repudiation of the October agreement, Wild Rose nullified the repudiation by e-mailing SMG after the termination letter and stating that it was "still willing to work on finding common ground." In response, Wild Rose argues this e-mail did not express a willingness by Wild Rose to engage in further negotiations under the October agreement. According to Wild Rose, the statement, "I am still willing to work on finding common ground," merely represented that its attorney would see whether Wild Rose had any interest in dealing with SMG on some other basis in the future, apart from the October agreement.

A repudiation may be retracted "if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final." *Id.* § 256, at 293. However, as noted above, "[an] injured party does change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation." *Id.* § 257, at 296.

Upon receipt of the termination letter, SMG's attorney responded by e-mail urging Wild Rose to continue to negotiate. After receiving the

e-mail from SMG urging Wild Rose to continue to negotiate, Wild Rose's attorney replied with a two-paragraph e-mail. The first paragraph responded directly to SMG's request that Wild Rose continue to negotiate a management agreement. This paragraph stated the attorney for Wild Rose would meet with Wild Rose and discuss "the future relationship, if any, with John Pavone." The use of the phrase "if any" is consistent with Wild Rose's prior repudiation. The first paragraph of the e-mail makes it clear that there will not be a future between the parties unless Wild Rose agrees to continue to negotiate.

The second paragraph of the e-mail responds to a 12:10 p.m. e-mail not contained in the record. This paragraph refers to the negotiations prior to the receipt of the letter by Wild Rose repudiating the contract. It contains the statement, "I am still willing to work on finding common ground but if this dispute is to be resolved, your adversarial & inflammatory e-mail messages will need to be curtailed." This sentence does not retract Wild Rose's repudiation. The sentence only indicates that Wild Rose's attorney will continue to negotiate as long as SMG's attorney curtails the tone of his e-mails.

A further fact indicating Wild Rose did not retract the repudiation is that Wild Rose did not communicate or negotiate further with SMG after the exchange of e-mails on May 24. Even though SMG sent Wild Rose a proposed management agreement for the Emmetsburg casino on July 12, Wild Rose never responded to the proposal. SMG's filing of the Emmetsburg action confirmed SMG knew of Wild Rose's repudiation.

Wild Rose's failure to get back to SMG after the exchange of e-mails on May 24 and its failure to respond to the proposed management agreement showed Wild Rose's clear intent not to retract its repudiation. SMG cannot claim Wild Rose retracted its repudiation by its unilateral

acts urging Wild Rose to continue to perform. *Id.* SMG's filing of the Emmetsburg action shows SMG understood Wild Rose repudiated the October agreement.

Therefore, we agree with the district court that there is no genuine issue of material fact as to whether Wild Rose retracted the repudiation.

**B. Claim Preclusion.** Because there is no genuine issue of fact concerning total repudiation of the October agreement, we must determine if the repudiation required SMG to bring a single claim for damages based on its remaining rights to performance under the October agreement.

1. *Claim preclusion generally.* The doctrine of res judicata includes both claim preclusion and issue preclusion. *Bennett v. MC #619, Inc.*, 586 N.W.2d 512, 516 (Iowa 1998). This case involves claim preclusion. *See, e.g., Iowa Coal Mining Co. v. Monroe Cnty.*, 555 N.W.2d 418, 441 (Iowa 1996) ("Res judicata in the sense of claim preclusion means that further litigation on the claim is barred."). The general rule of claim preclusion holds that a valid and final judgment on a claim bars a second action on the adjudicated claim or any part thereof. *Arnevik v. Univ. of Minn. Bd. of Regents*, 642 N.W.2d 315, 319 (Iowa 2002). "Therefore, a party must litigate all matters growing out of the claim, and claim preclusion will apply 'not only to matters actually determined in an earlier action but to all relevant matters that could have been determined.' " *Penn v. Iowa State Bd. of Regents*, 577 N.W.2d 393, 398 (Iowa 1998) (quoting *Shumaker v. Iowa Dep't of Transp.*, 541 N.W.2d 850, 852 (Iowa 1995)); *accord Leuchtenmacher v. Farm Bureau Mut. Ins. Co.*, 460 N.W.2d 858, 860 (Iowa 1990). Claim preclusion may preclude litigation on matters the parties never litigated in the first claim. *Arnevik*, 642 N.W.2d at 319.

> The policy of the law underlying claim preclusion is that a claim cannot be split or tried piecemeal. Thus, a party must try all issues growing out of the claim at one time and not in separate actions. An adjudication in a prior action between the same parties on the same claim is final as to all issues that could have been presented to the court for determination. Simply put, a party is not entitled to a "second bite" simply by alleging a new theory of recovery for the same wrong.

*Bennett*, 586 N.W.2d at 516–17 (emphasis and citation omitted); *accord Arnevik*, 642 N.W.2d at 319; *Penn*, 577 N.W.2d at 398; *Iowa Coal Mining Co.*, 555 N.W.2d at 441; *Barron G. Collier, Inc. v. Rawson*, 202 Iowa 1159, 1161, 211 N.W. 704, 704 (1927).

Claim preclusion does not apply "unless the party against whom preclusion is asserted had a 'full and fair opportunity' to litigate the claim or issue in the first action." *Arnevik*, 642 N.W.2d at 319 (quoting *Whalen v. Connelly*, 621 N.W.2d 681, 685 (Iowa 2000)). "A second claim is likely to be barred by claim preclusion where the 'acts complained of, and the recovery demanded are the same or where the same evidence will support both actions.'" *Id.* (quoting *Whalen*, 621 N.W.2d at 685 (citations omitted)). To establish claim preclusion a party must show: (1) the parties in the first and second action are the same parties or parties in privity, (2) there was a final judgment on the merits in the first action, and (3) the claim in the second suit could have been fully and fairly adjudicated in the prior case (i.e., both suits involve the same cause of action). *Arnevik*, 642 N.W.2d at 319; *see also Bennett*, 586 N.W.2d at 516; *Iowa Coal Mining Co.*, 555 N.W.2d at 440. "The absence of any one of these elements is fatal to a defense of claim preclusion." *Arnevik*, 642 N.W.2d at 319.

2. *Claim preclusion analysis.* In this case, there is no dispute the parties are the same or in privity. *See, e.g., Arnevik*, 642 N.W.2d at 319. In the Emmetsburg action, SMG filed suit against Gerald Kirke and Wild

Rose Entertainment, L.L.C. In the present action, SMG filed suit against Gerald Kirke and Wild Rose Clinton, L.L.C. Clearly, both actions involve SMG and Gerald Kirke. Moreover, Wild Rose Clinton, L.L.C. is a wholly owned subsidiary of Wild Rose Entertainment, L.L.C. The parties apparently agreed during the summary judgment hearing that the fact Wild Rose Clinton is a different entity from Wild Rose Entertainment was not relevant to Wild Rose's summary judgment motion, which raised the issue of claim preclusion. SMG also failed to raise any lack of privity arguments on appeal. Accordingly, SMG has not preserved any arguments with regard to lack of privity between Wild Rose Clinton and Wild Rose Entertainment for our review.

Likewise, it is undisputed there was a final judgment on the merits in the Emmetsburg action. *Arnevik*, 642 N.W.2d at 319. In the Emmetsburg action, the jury returned a verdict finding Wild Rose Entertainment breached both paragraph 3A and paragraph 5A of the October agreement and awarded SMG $10 million in damages. Accordingly, the district court entered judgment on the jury verdict for $10 million.

Finally, to establish claim preclusion, Wild Rose must establish the claim in the second suit could have been fully and fairly adjudicated in the prior case (i.e., both suits involve the same cause of action). *Arnevik*, 642 N.W.2d at 319. SMG argues Wild Rose has failed to establish the defense of claim preclusion because it failed to show the Clinton action is for the same cause of action as the Emmetsburg action.

To determine whether the claim in the second suit could have been fully and fairly adjudicated in the prior case, that is, whether both suits involve the same cause of action, this court must examine: "(1) the protected right, (2) the alleged wrong, and (3) the relevant evidence."

*Iowa Coal Mining Co.*, 555 N.W.2d at 441; *accord Arnevik*, 642 N.W.2d at 319; *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 287 (Iowa 1976) (stating the "identity of cause of action is established when the same evidence will maintain both actions").  However, we carefully distinguish between two cases involving the same cause of action—where claim preclusion bars initiation of the second suit—and two cases involving related causes of action—where claim preclusion does not bar initiation of the second suit.  *Iowa Coal Mining Co.*, 555 N.W.2d at 442. The Restatement (Second) of Judgments explains that a single cause of action

> connotes a natural grouping or common nucleus of operative facts.  Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes.  Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first.  If there is a substantial overlap, the second action should ordinarily be held precluded.  But the opposite does not hold true; even when there is not a substantial overlap, the second action may be precluded if it stems from the same transaction or series.

Restatement (Second) of Judgments § 24 cmt. *b*, at 199 (1982).

The Restatement (Second) of Contracts states that "a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach."  Restatement (Second) of Contracts § 243(2), at 250.  The Restatement further explains that "a claim for damages for total breach is one for damages based on *all* of the injured party's remaining rights to performance."  *Id.* § 243 cmt. *a*, at 251 (emphasis added).  Thus,

> [a]n injured party who has a claim for damages for total breach as a result of a repudiation, and who asserts a claim

merely for damages for partial breach, runs the risk that if he prevails he will be barred under the doctrine of merger from further recovery, even in the event of a subsequent breach, because he has "split a cause of action."

*Id.* § 243 cmt. *b,* at 252. The Restatement (Second) of Judgments similarly states,

[I]f the initial breach is accompanied or followed by a "repudiation" . . . and the plaintiff thereafter commences an action for damages, he is obliged in order to avoid "splitting," to claim all his damages with respect to the contract, *prospective as well as past,* and judgment in the action precludes any further action by the plaintiff for damages arising from the contract.

Restatement (Second) of Judgments § 26 cmt. *g,* at 240 (emphasis added).

On March 31, 2006, SMG filed the Emmetsburg action alleging Wild Rose breached paragraph 5A of the October agreement by failing to negotiate in good faith a management agreement for the Emmetsburg casino. The breach alleged in the Clinton action occurred on May 24, 2005, when Wild Rose repudiated the agreement and subsequently did not perform. This alleged breach created a single cause of action for all claims for damages based on its remaining rights to performance under the October agreement. *See* Restatement (Second) of Contracts § 243 cmt. *a,* at 251.

On June 8, 2006, a little over two months after filing the Emmetsburg action, SMG learned the IRGC awarded Wild Rose a second gaming license to develop and operate a casino in Clinton. SMG did not contact Wild Rose and Wild Rose did not contact SMG to attempt to negotiate a management agreement for the Clinton casino. Wild Rose had long since repudiated all of its obligations under the October agreement with its termination letter of May 24, 2005. However, SMG did not amend its pleadings in the Emmetsburg action to include any

potential Clinton allegations or attempt to introduce evidence of damage resulting from Wild Rose's failure to negotiate a management agreement for the Clinton casino. SMG waited until August 15, 2008, eleven months after the court entered judgment in the Emmetsburg action, to file the Clinton action seeking to recover additional damages.

The Clinton action involved the same protected right—to enter into good faith negotiations with Wild Rose for the management of "any other casino in Iowa" Wild Rose "had the opportunity to develop or operate"— as the Emmetsburg action. *See Iowa Coal Mining Co.,* 555 N.W.2d at 441. This second action involves the same alleged wrong—Wild Rose's failure to negotiate such an agreement in good faith pursuant to paragraph 5A of the October agreement—as the Emmetsburg action. *See id.* Finally, this second action would involve much of the same relevant evidence as was offered in the original Emmetsburg action, such as the parties' relationship, the terms of the October agreement, Wild Rose's alleged paragraph 5A breach, and its repudiation of the October agreement. *See id.* Moreover, both the Emmetsburg and Clinton actions share a common nucleus of operative facts and are closely related in time, space, origin, and motivation. *See* Restatement (Second) of Judgments § 24 cmt. *b,* at 198–99. Thus, the Emmetsburg and Clinton actions involve the same cause of action, meaning they could have been fully and fairly adjudicated in the original Emmetsburg action. *See Arnevik,* 642 N.W.2d at 319.

Finally, SMG argues claim preclusion is not a bar to its Clinton action because the Clinton action developed after the filing of the Emmetsburg claim. In support of this argument, SMG cites Iowa Code section 611.19, which provides that "[s]uccessive actions may be

maintained upon the same contract or transaction whenever, after the former action, *a new cause of action* has arisen thereon or therefrom." Iowa Code § 611.19 (2007) (emphasis added).

Wild Rose breached the October agreement when it first failed to perform under paragraphs 3A and 5A of the October agreement and thereafter repudiated the agreement. *See Pavone I*, 801 N.W.2d at 494–95. SMG became aware of the underlying facts supporting its Clinton action when the IRGC awarded the Clinton license and Wild Rose did not name SMG as manager. SMG learned of these facts shortly after SMG filed the Emmetsburg action, but well before the court entered the judgment in the Emmetsburg action. SMG had sufficient time and opportunity to amend its Emmetsburg action to seek additional damages due to the breach of paragraph 5A of the October agreement in regards to the Clinton casino. SMG, in a single cause of action and within the statute of limitations, was required to bring all claims for damages based on its remaining rights to performance under the October agreement. Section 611.19 applies to new causes of action and does not apply if the accrual of additional damages stem from a breach of the original contract. *Russell & Co. v. Polk Cnty. Abstract Co.*, 87 Iowa 233, 244, 54 N.W. 212, 215 (1893). Because a new cause of action has not arisen, we find section 611.19 inapplicable.

Accordingly, the court of appeals and district court correctly held the doctrine of claim preclusion barred SMG from bringing the Clinton action.

## IV. Disposition.

We find no genuine issue of material fact exists as to whether Wild Rose repudiated the October agreement. We also hold the doctrine of

claim preclusion bars this action. Therefore, we affirm the decision of the court of appeals and the judgment of the district court.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Appel, Waterman, and Mansfield, JJ., who take no part.