# IN THE COURT OF APPEALS OF IOWA

No. 24-1158
Filed June 18, 2025

**CMT HIGHWAY, LLC,**
      Plaintiff/Counterclaim Defendant,
      Appellant/Cross-Appellee,

**vs.**

**LOGAN CONTRACTORS SUPPLY, INC.,**
      Defendant/Counterclaim Plaintiff,
      Appellee/Cross-Appellant.
_____

Appeal from the Iowa District Court for Cedar County, Jeffrey D. Bert, Judge.

A construction-material manufacturer appeals from a ruling that it breached its contracts with a construction-material supplier. The construction-material supplier cross-appeals the rates of pre- and post-judgment interest on various awards. **AFFIRMED ON APPEAL; VACATED IN PART AND REMANDED WITH INSTRUCTIONS ON CROSS-APPEAL.**

Molly M. Parker (argued), Samuel E. Jones, Steven J. Pace, and Kate Thorne of Shuttleworth & Ingersoll, Cedar Rapids, and Joseph C. Creen of Bush, Motto, Creen, Koury & Halligan, PLC, Davenport, for appellants/cross-appellees.

Michael W. Thrall (argued) and Matthew A. McGuire of Nyemaster Goode, P.C., Des Moines, and Roy Leaf of Nyemaster Goode, P.C., Cedar Rapids, for appellee/cross-appellant.

Heard at oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**AHLERS, Judge.**

Article 2 of the Uniform Commercial Code (UCC) governs this case. The case centers on the termination of a business relationship between a construction-material supplier, Logan Contractors Supply, Inc. (Logan Contractors), and a construction-material manufacturer, CMT Highway, LLC (CMT).

## I.      Background Facts

Governmental entities intending to build, modify, or repair a public road create plans for the project and publicly post them, seeking bids from contractors. As a part of developing a bid, prospective general contractors seek bids from subcontracting suppliers for materials needed to complete the project. Logan Contractors is such a supplier. For suppliers to provide a bid to the general contractor, the suppliers seek quotes from material manufacturers, like CMT. The supplier will notify the manufacturer if it uses the manufacturer's quote when submitting its bid to the general contractor. Likewise, the general contractor will notify the supplier if it uses its quote for its bid to the governmental entity. If the governmental entity selects the bid from the general contractor, then the general contractor is bound by its bid and Logan Contractors is bound by its bid to the general contractor. According to a Logan Contractors employee, the company has used this bid process for his entire seventeen-year career with the company, and it is consistent throughout the road-construction industry.

Logan Contractors started doing business with CMT in 2016, and the two companies followed the above-described process. When Logan Contractors sought to bid for a job with a general contractor doing a road project, Logan Contractors sought quotes from CMT. CMT would supply a quote. If Logan

Contractors accepted the quote, it would notify CMT that it was using CMT's quote in its bid. If the general contractor accepted the bid, Logan Contractors would notify CMT, and CMT would manufacture and supply the materials at the prices listed in the quote when it received a purchase order from Logan Contractors. Often Logan Contractors would submit multiple purchase orders as a project progressed through different phases of construction. The timing of those orders and delivery dates were not necessarily strictly set because the timing or progression of a project and materials needed at any given time was "fluid."

By 2021, CMT had difficulty meeting its production schedule and delivery dates for several projects. The price of steel, a raw material necessary for producing CMT's products, had increased, as had shipping costs. This made it difficult for CMT to produce and deliver materials to projects for Logan Contractors at the prices stated in their quotes. On October 27, the president of CMT sent the following email to the president of Logan Contractors:

> After studying the numbers and reviewing our notes from the conversation this morning, I have come up with the following proposals:
>
> 1.    CMT will continue to quote Logan on jobs they are sent quotes for and manufacture and deliver everything they currently have orders for with the following increases:
> 1.5 material will be billed at $6.95 a foot delivered price
> 1.25 material will be billed at $5.25 a foot delivered price
> 1.00 material will be billed at $3.90 a foot delivered price
> .75 material will be billed at $2.80 a foot delivered price
> Basket Stakes will be at $.06 higher than current cost
>
> These prices represent a cost that is well below current pricing but allows us to pass on the impact of our higher material cost and would pertain to all existing orders on the books as of today. We would not pass on any shipping cost as CMT will eat the cost of the freight.

> All material currently on the backlog would be manufactured and paid for by March 31, 2022. Any new work moving forward would be billed at negotiated price at time of order. Also, any additional orders will receive a $1,000 rebate per order (minimum a truckload of material) until the difference on original price and new price is made up.

> 2. Logan rejects proposal 1 as written, at which time CMT Highway LLC and Logan decide to end their working relationship and go their separate ways.

> Also, if you decide to move on, I want to thank you for your business over the years. I wish you continued success on the personal and business side. The ball is in your court and I will need an answer by EOB on Friday. Thanks!

When Logan Contractors sought clarification, CMT clarified that the proposed increased pricing was its "break even numbers on materials" and would apply to all outstanding purchase orders except for the "Offutt jobs."

Counsel for Logan Contractors informed CMT that it believed CMT breached its contracts by failing to deliver goods in a timely manner and attempting to increase the agreed-upon price. Counsel further informed CMT that Logan Contractors would find "alternative sources of supply in effort to minimize damages" and it "intend[ed] to hold CMT responsible for payment" of all damages. Logan Contractors then refused to pay for some of the materials CMT had already delivered for various projects.

CMT initiated this action to recover payment for the materials it previously delivered. Logan Contractors filed a counterclaim alleging CMT breached its contractual obligations when it did not provide materials at the originally agreed price and seeking damages for cover materials.

The matters were tried before the business specialty court, which determined that CMT breached its contracts with Logan and was liable for cover

material costs. The court also determined that Logan Contractors could not withhold payment for materials received from CMT. Both parties appeal.

## II. Standard of Review

While we review the business court's contract interpretation and construction for correction of errors at law, *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 683 (Iowa 2020), the business "court's factual findings have the effect of a special verdict and are binding on us if supported by substantial evidence." *Pitz v. U.S. Cellular Operating Sys.*, 989 N.W.2d 636, 640 (Iowa 2023) (citation omitted). "Evidence is substantial if a reasonable person would accept it as adequate to reach a conclusion." *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005). "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Id.* (citation omitted). When completing our review, we view the evidence in the light most favorable to the business court's ruling. *Id.*

## III. CMT's Appeal

We begin by addressing CMT's claims. First, it argues that Logan Contractors failed to establish there were binding contracts between them or that CMT breached any contracts. Second, CMT claims the court erred by awarding Logan Contractors damages for cover material costs. Finally, CMT argues the court miscalculated the damages award because it included damages for projects other than the projects at issue.

**A.     Existence of Contracts and Breach**

*1.     Formation of contracts*

CMT contends the business court's determination that contracts were created with Logan Contractors is not supported by substantial evidence. Both parties agree that article 2 of the UCC, codified in Iowa Code chapter 554 (2022), governs this action, as it involves the sale of goods. "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Iowa Code § 554.2204(1). And "[e]ven though one or more terms are left open[,] a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." *Id.* § 554.2204(3). That is in keeping with chapter 554's requirement that it "must be liberally construed and applied to promote its underlying purposes and policies . . . to simplify, clarify, and modernize the law governing commercial transactions" and "to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties." *Id.* § 554.1103(1)(a), (b). With that in mind, we review whether there is substantial evidence in the record to support the business court's determination that CMT and Logan Contractors entered contracts for the various projects at issue.

CMT contends that it could not enter into binding contracts with Logan Contractors until both parties agreed on firm delivery dates, and as there were no firm delivery dates set, contracts were not created. We disagree. The business court's determination that definitive delivery dates were not a necessary component to the contracts because "all industry players understand that delivery

dates can be a 'moving target'" is supported by substantial evidence. Logan Contractors' employee testified as such, as did an employee for a different materials manufacturer.[1] In fact, CMT's contentions that it could not enter into a contract with Logan Contractors without a set delivery date is contrary to the entire practice of the public road construction industry. Logan Contractors needed to know the cost of materials when putting together a bid for a general contractor because it would be bound by its bid should it be selected by the contractor. It could only know the cost of materials to create that bid if its acceptance of CMT's quote was a binding agreement that locked in the materials at a set price. And at that time, there would be no way for Logan Contractors to be able to provide definitive delivery dates. As a Logan Contractors employee noted, the timing and progress of road construction is fluid because it depends on several factors like weather and performance of other contractors..

We find substantial evidence supporting the business court's conclusion that "[t]he course of dealing between the parties demonstrates an understanding that CMT's obligation was binding to Logan Contractors upon notification that CMT's quote had been accepted,[2] and Logan Contractors had been awarded the project by the general contractor." This conclusion is supported not only by the parties' past practice, but also by the terms included within CMT's quotes. It is apparent that CMT knew it was proposing binding terms each time it provided

---

[1] The business court found the employee from the third-party materials manufacturer "to be reliable and credible on industry practices." We defer to that credibility determination.

[2] CMT's sales director acknowledged that Logan informed CMT that it accepted its bids on all the projects.

Logan Contractors with a quote for a project.  For example, a quote for one project

included the following section:

TERMS:
**Purchasing**
The prices shown are firm through December 31, 2021, except as noted above [an above notation added predetermined cost variables if materials were shipped with pallets or bags] and for the following items.  Add 4% starting January 1, 2022 and for every 6 months thereafter.

Escalators can be avoided for 2022 & 2023 if we are able to produce during November-January 2022 and submit payment of stock-piled material for material that is to deliver in 2022 & 2023[.]

A verbal commitment, signed acknowledgment or purchase order is required within 15 days of the letting date.  After this 15 day time period, we reserve the right to withdraw this quotation or re-quote at our discretion[.]

Our pricing is not subject to deduction by an indexes, regulation or agreements made by the contractor and the owner of the project.  Pricing does not include sales tax.  Add any applicable state and local taxes.

Any changes made after purchase orders are accepted must be made in writing and agreed upon by the CMT Highway sales department.

**Delivery**
These prices are based upon delivery of all materials on or before December 31,2021, except as noted above.  Deliveries occurring after this date are subject to an additional charge to be determined.

Delivered prices are based on shipping In truckload quantities. Any partial shipments are subject to additional freight charges.

Shipments delayed more than two (2) hours in unloading will Incur an extra charge of $60.00 per hour in 1/4 hour increments[.]

**Payments:**
Net 30 Days from the date of the invoice.  A 1.5% finance charge, accrued monthly will be applied to outstanding balances thirty days past due[.]

Once CMT submitted the quote offering to be bound by its terms—including prices being "firm" through December 31, 2021—and Logan Contractors accepted the quote including these key terms, the two formed a binding contract. And their course of dealing since 2016 establishes that both companies understood themselves to be bound by the terms of the quote.[3]

2. *Breach*

CMT argues that its attempts to renegotiate the price of goods for the contracts did not amount to breach, noting that the president of Logan Contractors admitted he had renegotiated the price of goods in past instances. But the business court's conclusion that the October 27 email amounted to breach of the contracts is supported by the content of the email. It was not an attempt at renegotiation as CMT now claims. It was notification that CMT would not produce and deliver materials to Logan Contractors for outstanding purchase orders at the prices that the parties had agreed were "firm" through the end of the year. In other words, CMT notified Logan Contractors that it would not perform under a key, if not the most important, term of their contracts—the previously agreed price. This amounts to breach.

3. *Successive performance contracts*

CMT contends that we should view its contracts with Logan Contractors as successive performance contracts that could be terminated through reasonable notification. *See id.* § 554.2309(2) ("Where the contract provides for successive

---

[3] Like the business court, we do not credit Logan Contractors' "cancelling" of twenty agreements as negating the course of dealing established by hundreds of other agreements that were formed through the quote-and-acceptance format.

performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."), (3) ("Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable."). In CMT's view, the October 27 email was simply notification that it was terminating the contracts and could not amount to breach.

The business court aptly rejected this argument because the contracts are not successive performance contracts. Although the exact timing of performance could change under the contracts, the contracts were not "indefinite in duration." *See id.* § 232.2309(2). The business court explained:

> The court rejects the argument that the contracts between CMT and Logan Contractors were successive performance contracts. The contracts related to public paving and road construction projects were finite in scope. The quotes issued by CMT contained fixed amounts. And the CMT quotes contained a disclaimer that pricing was "firm" through a certain date, usually December 31, 2021. The CMT quotes further indicated the prices were based upon delivery by a certain date, usually December 31, 2021. None of these factors are indicative of a contract that is indefinite in duration. In fact, the language used by CMT in their quotes recognizes the possibility that CMT might be required to make deliveries after December 31, 2021.

(Footnote omitted.) We adopt this rationale as our own.

## B.    Cost of Cover Goods

When a seller fails to make delivery or repudiates a contract, "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." *Id.* § 554.2712(1). After CMT breached, Logan Contractors got quotes

from other businesses for substitute materials and contracted with different businesses to produce and deliver the materials to its projects that CMT was supposed to produce and deliver. This resulted in Logan Contractors paying $1,529,264.57 more for the materials than it had originally agreed to pay CMT. The business court found Logan Contractors acted in good faith and without unreasonable delay in covering in this manner. As a result, it awarded Logan Contractors $1,529,264.57 in damages caused by CMT's breach. *See id.* § 554.2712(2).

But CMT argues that Logan Contractors did not act reasonably in purchasing cover goods because it did not accept the lowest alternative substitute. Thus, CMT contends Logan Contractors failed to mitigate its damages. As the breaching party, it is up to CMT to prove that Logan Contractors failed to adequately mitigate damages. *See UE Local 893/IUP v. State*, 997 N.W.2d 1, 15 (Iowa 2023).

CMT argues it proved Logan Contractors failed to mitigate its damages because the price increase proposed in its October 27 email only raised the cost to Logan Contractors by $310,082.08. In contrast, using third party contractors to cover CMT's breach resulted in increased costs to Logan Contractors of $1,529,264.57. CMT contends it was unreasonable and a failure to mitigate damages for Logan Contractors to pay cover costs of $1,529,264.57 with third parties when it would have only incurred cover costs of $310,082.08 had it purchased the materials from CMT. In support of its position, CMT relies on a comment to Restatement (Second) of Contracts that states that "[i]f the party in breach offers to perform the contract for a different price, this may amount to a

suitable alternative" so long as it is not "condition[ed] on surrender by the injured party of his claim for breach." Restatement (Second) of Contracts § 350 cmt. e (Am. L. Inst. 1981).

We are not persuaded by CMT's cited authority or argument. While principles of law and equity still apply in cases governed by the UCC, that is true only when those principles are not "displaced by the particular provisions" of the UCC. Iowa Code § 554.1103(2). Section 554.2712 is a "particular provision" governing this situation, and it permits the buyer aggrieved by a seller's breach to "purchase goods in substitution for those due from the seller" and then recover damages from the breaching seller. *See id.* § 554.2712(1), (2). The plain language of section 554.2712(1) contemplates purchasing cover goods from someone other than the breaching seller, and CMT provides no explanation how requiring Logan Contractors to purchase the very same goods from CMT, just at a higher price than the parties agreed to, constitutes "substitution for those due from the seller." The plain language of the statute defeats CMT's argument.

But even if we were to ignore the plain language of section 554.2712(1) and conclude that an aggrieved buyer could be required to cover by purchasing the same goods from the breaching seller at a higher price, we are not persuaded Logan Contractors was required to do so here. In addition to raising prices on materials, the October 27 email stated that "any additional orders will receive a $1,000 rebate per order (minimum a truckload of material) until the difference on original price and new price is made up." So in essence, the $1000 rebate language would functionally "surrender" the cover claims of Logan Contractors by providing an alternative resolution and force Logan Contractors into future

contracts to recoup the damages it sustained. But the very authority CMT relies on—comment e to section 350 of the Restatement (Second) of Contracts—prohibits such surrender of an aggrieved buyer's claim for damages when it suggests it may be a "suitable alternative" to require an aggrieved buyer to purchase from the breaching seller. Surrendering the claims for cover damages negates any obligation Logan Contractors may have otherwise had to purchase from CMT. As a result, having CMT produce and deliver the materials at the higher price was not a suitable alternative as contemplated by the Restatement. *See* Restatement (Second) of Contracts § 350 cmt. e. Because having CMT produce the materials at a higher price was not a suitable alternative, we conclude that substantial evidence supports the business court's conclusion that Logan Contractors acted reasonably when it contracted with other manufacturers to produce and deliver the cover materials despite the higher cost.

As to the specific amount of cover damages awarded to Logan Contractors, CMT identifies three projects where it contends Logan Contractors did not accept the lowest bid for alternative materials and argues it should not be required to pay cover damages beyond the lowest bid as to those three projects. But Logan Contractors points out that when CMT compared the bids for alternative materials, it failed to factor in delivery cost. After factoring in delivery charges along with the cost of the materials, Logan Contractors did in fact select the most cost-effective alternative materials for each project.

## C. Damages For Offutt Projects

Finally, CMT argues the business court should not have awarded Logan Contractors cover damages for alternative materials for projects known as the

Offutt projects because it clarified that the Offutt projects were not subject to the price increases demanded in the October 27 email. This argument may seem logical on first consideration, but not after consideration of the surrounding circumstances. CMT's October 27 email made it clear that if Logan Contractors would not agree to pay the increased prices on all other projects, then CMT would simply terminate their business relationship. There was no carve-out for the two companies to continue to work together on just the Offutt projects. So while the Offutt projects were not subject to the price increases, CMT's willingness to perform under those contracts was still tied to Logan Contractors paying the higher prices on the other projects. Once Logan Contractors refused to pay the increased prices on the other projects, the October 27 email made it clear that CMT would no longer work with Logan Contractors at all as the email stated if Logan Contractors refused to pay the higher prices, then CMT would "end their working relationship and go their separate ways." This amounted to CMT's repudiation of contracts for all projects, including the Offutt projects. *See Pavone v. Kirke*, 807 N.W.2d 828, 833 (Iowa 2011) ("A repudiation is accomplished by words or acts before the time of performance evidencing an intention to refuse to perform in the future."). That required Logan Contractors to look elsewhere to secure the materials needed for all projects, including the Offutt projects. As such the business court correctly awarded Logan Contractors cover damages for the Offutt projects as well.

## IV. Logan Contractors' Cross-Appeal

We move to Logan Contractors cross-appeal. Both of Logan Contractors' claims relate to interest on the judgments awarded to both parties.

**A.      Prejudgment Interest Awarded to CMT**

The business court awarded prejudgment interest at the rate of 1.5% per month on $539,158.00 of the $772,515.36 Logan Contractors owed CMT for previously delivered materials.  That interest amounted to $192,716.85.  After adding in the interest, the business court concluded CMT was entitled to $965,232.21.

Logan Contractors does not contest the business court's reasoning or calculations of prejudgment interest.  At issue is the business court's later conclusion that awarded CMT the $965,232.21 (which already included the $192,716.85 in prejudgment interest) "plus interest from October 27, 2021, at the contract rate of 18%, and recoverable costs."  Logan Contractors points out this would award CMT double interest because all interest CMT is entitled to receive is already included in the judgment amount of $965,232.21.  And because the business court set off the judgment against the award to Logan Contractors, no further interest would accrue.

Logan Contractors asks that we remand to the business court to correct the judgment entered in favor to CMT to read, "The court enters judgment in favor of CMT and against Logan Contractors on count I of the petition filed March 1, 2022, in the amount of $965,232.21 and recoverable costs."  In its reply brief, CMT "has no resistance to Logan Contractor's request."  Accordingly, we grant relief on this aspect of Logan Contractors' cross-appeal, and we remand to the business court for entry of a corrected judgment in accordance with Logan Contractors' request, as conceded by CMT.

## B.     Post-judgment Interest Awarded to Logan Contractors

Finally, Logan Contractors argues that the business court did not correctly set post-judgment interest on its counterclaim against CMT.  The business court awarded interest at the annual rate of 5% from March 1, 2024, the date the court entered judgment.  Logan Contractors contends this is the wrong interest rate and the wrong start date.  It asserts interest should have been set at the statutory rate of 6.83%[4] from the date it filed its counterclaim.  *See* Iowa Code §§ 535.3(1)(a) ("Interest shall be allowed on all money due on judgments and decrees of courts at a rate calculated according to section 668.13."), 668.13(1) ("Interest, except interest awarded for future damages, shall accrue from the date of the commencement of the action."), (3) ("Interest shall be calculated as of the date of judgment at a rate equal to the one-year treasury constant maturity published by the federal reserve in the H15 report settled immediately prior to the date of the judgment plus two percent.").

CMT argues Logan Contractors failed to preserve error on this claim.  Logan Contractors contends it preserved error via its post-trial brief to the business court.

Logan Contractors' post-trial brief does not support its error-preservation claim.  In that brief, Logan Contractors took the following position:

- Logan Contractors was entitled to interest from the date it incurred its cover damages at the rate of 5%—which it referred to as the "statutory interest rate."
- Using a per diem amount calculated by using a 5% interest rate, Logan Contractors provided an accumulated total of interest through the first day of trial and asked for an award of that amount as well as interest after the first day of trial at the same per diem rate (based on 5% interest).

---

[4] There is no dispute that 6.83% is the applicable statutory rate, as the one-year treasury bill rate as of the date of judgment was 4.83%.

- Logan Contractors supported its claims for interest by citing Iowa Code section 535.2(1)(b).

While the business court rejected Logan Contractors' claim for interest from the date it incurred its cover damages due to lack of sufficient proof—a conclusion Logan Contractors doesn't challenge on appeal—the court largely followed the rest of Logan Contractors' request when it awarded Logan Contractors interest at the requested rate of 5% from the date of judgment.

Given the position Logan Contractors took in its post-trial brief—a position the business court generally followed—Logan Contractors likely invited the error of which it now complains.  *See Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1991) ("[A party] cannot deliberately act so as to invite error and then object because the court has accepted the invitation.").  But at the very least, Logan Contractors failed to preserve error by taking a position on appeal that conflicts with the position it took with the business court without having given the business court the chance to consider the new position.  *See State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court.").  Rather than the 5% interest claim in its post-trial brief, Logan Contractors now claims interest of 6.83%.  Rather than focusing on the first day of trial as the start date for interest as it did in its post-trial brief, it claims interest from the date of filing its counterclaim. And rather than relying on section 535.2(1)(b)—the only Code section cited in support of its claim for interest in its post-trial brief—it relies on sections 535.3(1)(a) and 668.13(1), (3).  Given what it had pitched to the business court in its post-trial brief, if Logan Contractors felt the court misinterpreted its argument in setting

interest on the judgment, Logan Contractors had the obligation to file a motion under Iowa Rule of Civil Procedure 1.904(2) or in some other way call the claimed error to the business court's attention. By failing to do so, Logan Contractors failed to preserve error on this issue. *See Waterloo Sav. Bank v. Austin*, 494 N.W.2d 715, 717–18 (Iowa 1993) (finding error preserved on interest rate and start date only when the appealing party provided adequate information in its district court filings "to alert the district court to the requested relief"); *Cincinnati Ins. Co. v. McKasson*, No. 23-0974, 2024 WL 4615898, at \*4 (Iowa Ct. App. Oct. 30, 2024) (requiring the filing of a rule 1.904(2) motion to preserve error when an issue only became apparent upon the filing of the challenged district court decision). Because error is not preserved, we decline to address the merits of this issue and leave the business court's decision intact on this issue.

## V.     Conclusion and Instructions

As to CMT's appeal, we affirm the ruling that CMT breached its contracts with Logan Contactors and that Logan Contractors is entitled to damages for cover materials. We do not disturb the amount of damages awarded.

As to Logan Contractors' cross-appeal, we grant relief in part by vacating that part of the decision that awarded interest to CMT twice. On remand, the business court shall replace the first paragraph of its conclusion on page 36 of its ruling and order with this language:

> For the reasons set forth herein, the court enters judgment in favor of CMT and against Logan Contractors on count I of the petition filed March 1, 2022, in the amount of $965,232.21 plus recoverable costs.

All other aspects of the court's ruling are affirmed. Costs on appeal are assessed to CMT.

**AFFIRMED ON APPEAL; VACATED IN PART AND REMANDED WITH INSTRUCTIONS ON CROSS-APPEAL.**